**In re Barbara Jean PULLEY, Debtor.**

**Barbara Jean Pulley, Plaintiff,**

**v.**

**Diane Legreide, individually and in her capacity as Director of the Division of Motor Vehicles, and Peter C. Harvey, individually and in his capacity as Acting Attorney General of New Jersey, and the State of New Jersey, Defendants.**

**Bankruptcy No. 97–23436 RG.**
**Adversary No. 00–3666.**

United States Bankruptcy Court, D. New Jersey.

June 25, 2003.

Peter C. Harvey, Acting Attorney General of New Jersey, Carol Johnston, Deputy Attorney General of New Jersey, Trenton, NJ.

Neil J. Fogarty, Esq., Northeast New Jersey Legal Services, Inc., Jersey City, NJ.

## OPINION

MORRIS STERN, Bankruptcy Judge.

Plaintiff-debtor moves for summary judgment in this adversary proceeding, seeking a determination that motor vehicle "surcharges" levied against her by the New Jersey Division of Motor Vehicles ("DMV") pursuant to N.J.S.A. 17:29A–35, are dischargeable debts in her Chapter 7 bankruptcy case. Defendant New Jersey,[1]

---

1. The named initial defendants were C. Richard Kamin, individually and in his capacity as

Director of the New Jersey Division of Motor Vehicles, and John J. Farmer, Jr., individually

waiving any right to sovereign immunity, cross-moves for a summary judgment declaring the challenged surcharges to be an exception to discharge pursuant to 11 U.S.C. § 523(a)(7).[2]

This is a matter within this court's jurisdiction, and is a core proceeding.[3] For the purposes of this opinion, the key inquiries center on whether the surcharges at issue are "payable ... for the benefit of a governmental unit," and whether the "Market Transition Facility" ("MTF"), successor to the "New Jersey Automobile Full Insurance Underwriting Association" ("JUA"), is such a governmental unit. See 11 U.S.C. § 523(a)(7); N.J.S.A. 17:30E–4; and N.J.S.A. 17:33B–11. Certain related issues have been decided in this district in a number of Chapter 7 cases with varying results.[4] Similar issues have been decided in Chapter 13 cases.[5]

Summary judgment is appropriate in this case. Basic facts are not in dispute;

---

and in his capacity as Attorney General of New Jersey, now replaced as to the individuals by successors to the State offices. Plaintiff, with leave to file an Amended Complaint, then added the Division of Motor Vehicles and the State of New Jersey.

2. Title 11 of the United States Code is hereinafter referred to as the "Code" or "Bankruptcy Code." Code § 523(a)(7) insofar as it is relevant here provides an exception to discharge for an individual debtor for "any debt," as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
(7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, ...
11 U.S.C. § 523(a)(7).

3. The court has jurisdiction pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference of the United States District Court of New Jersey dated July 23, 1984. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

4. In re Lugo, 94 B.R. 335 (D.N.J.), aff'd, 886 F.2d 602 (3d Cir.1989) (District Court held that DMV surcharges imposed for driving while intoxicated, under the pre–1990 amendment text of 11 U.S.C. § 523(a)(9), were nondischargeable, though the 11 U.S.C. § 523(a)(7) exception did not apply because the recipient and benefiting entity, the JUA, was not a "governmental unit") (the Court of Appeals held that the DMV surcharge was a pre-petition debt, not an insurance premium, was civil and remedial in nature, affirmed District Court as to its finding that surcharge was nondischargeable under pre–1990 11 U.S.C. § 523(a)(9), but it did not evaluate the application of 11 U.S.C. § 523(a)(7) nor describe surcharge to be a penalty); In re Kish, 238 B.R. 271 (Bankr.D.N.J.1999) ("Kish IV") (the court found that, though DMV surcharges are a penalty, the State did not meet its burden to prove that they were payable "to and for the benefit of a governmental unit"); In re Kish, 221 B.R. 118 (Bankr.D.N.J.1998) ("Kish III") (under the Eleventh Amendment test set forth in Christy v. Pennsylvania Tpk. Comm'n, 54 F.3d 1140, 1144 (3d Cir.1995), JUA was held to be an arm of the State and MTF was not); In re Curtin, 206 B.R. 694 (Bankr.D.N.J.1996) (adopted the holding in In re Kent that JUA was found to be a governmental unit and declared that "it is logical to conclude that the surcharge is for the benefit of a governmental unit"); In re Kent, 190 B.R. 196 (Bankr.D.N.J.1995) (formulated a five-part test to determine whether an entity is a governmental unit and held that DMV surcharge was a penalty, that JUA and MTF were governmental units, and that the surcharge was nondischargeable); In re Graham, 85 B.R. 713 (Bankr.D.N.J.1988) (DMV surcharge found to be an additional insurance premium, but, because it was not a pre-petition debt, was nondischargeable).

5. In re Marcucci, 256 B.R. 685 (D.N.J.2000); In re Bill, 90 B.R. 651, 652–53 (Bankr.D.N.J. 1988); In re DeBaecke, 91 B.R. 3 (Bankr. D.N.J.,1988); In re Christensen, 95 B.R. 886, 892–93 and 898 (Bankr.D.N.J.1988); In re Adams, 106 B.R. 811 (Bankr.D.N.J.1989); In re Burkhardt, 220 B.R. 837, 849–50 (Bankr. D.N.J.1998); In re Havens, 229 B.R. 613 (Bankr.D.N.J.1998); In re DeJesus, 243 B.R. 241 (Bankr.D.N.J.1999).

certifications and documents have been submitted as the immediate record; New Jersey statutory and case law are to be surveyed in deciding what are basically questions of law; and, the many prior related decisions in this district provide ample legal and factual background. Triable issues are thus obviated. *See* FED.R.CIV.P. 56 and FED. R. BANKR.P. 7056.

## MRS. PULLEY'S MOTOR VEHICLE INFRACTIONS/STATUS OF DRIVING PRIVILEGES

Mrs. Pulley, a resident of Jersey City, was involved in an automobile accident on July 15, 1991. Shortly before, by order of June 21, 1991 of the Jersey City Municipal Court, Mrs. Pulley's driver's license had been suspended based upon unpaid parking violations. At the scene of the accident, Mrs. Pulley was cited for driving without liability insurance.

She was convicted in Jersey City Municipal Court on September 17, 1991 of driving without liability insurance and driving while her license was suspended.[6] DMV sent plaintiff surcharge bills on September 1, 1992, on September 1, 1993 and on September 1, 1994.[7] The State yet again suspended Mrs. Pulley's license both on December 27, 1992 and on October 17, 1993 for failing to pay these surcharges. Loss of driving privileges is a consequence of default in payment of DMV surcharges. N.J.S.A. 17:29A–35(b)(2) ("If . . . a driver fails to pay a surcharge levied . . . the license of the driver shall be suspended forthwith until the surcharge is paid. . . .").

Plaintiff filed a petition in bankruptcy under Chapter 7 on March 24, 1997. Her petition showed no income for 1994 through 1996, and only $515 per month from Social Security ("SSI") thereafter. Listed unsecured debts totaled over $31,000, including a debt to "NJ MVS Auto Ins Sur & Coll" for DMV surcharges in the amount of $1,000, which she divided as $900 priority unsecured and $100 general unsecured (the latter apparently representing an earlier applicable ten-percent DMV administrative fee).[8] An order discharging the plaintiff from all dischargeable debts was entered on July 7, 1997. The bankruptcy case was closed on April 2, 1998.

On December 17, 1997, the State sent Mrs. Pulley a form letter which acknowledged her July 7, 1997 discharge but demanded payment of the surcharge debt, in the claimed amount of $1,429.24. The letter declared:

> The protection of the stay provisions ended with the court's entry of a discharge order. You are now required to resume payment of your surcharge assessment. A bankruptcy court ruling in 1995 determined that surcharges are non-dischargeable civil penalties.

The "bankruptcy court ruling in 1995" presumably refers to *In re Kent.*

On February 25, 2000, the Municipal Court of Jersey City rescinded its June 21, 1991 suspension of plaintiff's driver's license. After the rescission of this suspension and debtor's attorney's demand of DMV for reinstatement of driving privi-

---

**6.** N.J.S.A. 39:6B–2 and N.J.S.A. 39:3–40; *see* N.J.A.C. 13:19–13.1(b).

**7.** A Notice of Proposed Judgment, issued pursuant to N.J.S.A. 17:29A–35(b)(2), dated December 20, 1996, shows that two $500 surcharges (labeled year 1 and year 2) were applied to plaintiff because she was driving while uninsured at the July 15, 1991 accident

(plaintiff's Exhibit 3.1, Notice of Proposed Judgment).

**8.** *See* N.J.S.A. 17:29A–35(b)(2)(*compare* 1990 and 1996 versions). Presumably, if an administrative fee were retained by DMV, that would disqualify *the fee* from the exception to discharge of 11 U.S.C. 523(a)(7) as being for "actual pecuniary loss."

leges, the State appears to have allowed Mrs. Pulley to apply for a *permit* as a precursor to applying for a driver's license.

On August 8, 2000, debtor moved to reopen her bankruptcy case to initiate this adversary proceeding to determine the dischargeability of the DMV surcharges. The case was reopened by order entered on September 29, 2000, and debtor filed her complaint on that same day. The complaint has implicated the origins, legislative development, and range of applications of the DMV surcharges.

### DEVELOPMENT AND APPLICATION OF DMV SURCHARGES IN NEW JERSEY

In a nutshell, insurers in the automobile insurance market (as well as insurance companies in many other markets) have historically relied on the "surcharge" technique to adjust, after the fact of coverage, premium charges based upon actual and particular experience with insureds or a host of other factors. Surcharges on automobile insurance premiums became commonplace (and their nonuniformity in New Jersey a source of grave concern to the Legislature), as the market tightened in the early 1980s. As premium prices skyrocketed, the open market in New Jersey for automobile coverage—at affordable rates—continued to collapse.[9]

The Legislature acted twice in 1982 to remedy the burgeoning problem. First, through the Automobile Insurance Reform Act of 1982, N.J.S.A. 17:29A–33 *et seq.*, a more equitable and uniform Merit Rating Plan was established equalizing allowed surcharges. At the same time, the DMV surcharges here at issue were established (and carved out of the private marketplace's surcharging purview[10]). A second 1982 enactment, the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:30E–1 *et seq.*, created JUA, an insurer of last resort organized to provide affordable automobile liability coverage. DMV surcharges were intended to fund, in part, JUA's operation. JUA membership included all insurers who would sell automobile coverage in New Jersey. Participation in this joint underwriting association was mandatory. Operating to assure market availability for New Jersey consumers, JUA issued policies in its own name.[11] However, it failed (miserably and expensively), and by 1990 was hopelessly insolvent. The 1990 Fair Automobile Insurance Reform Act, N.J.S.A. 17:33B–1 *et seq.*, was to replace JUA with a transitional membership entity, MTF (again, a joint insurance underwriting association which was a policy issuer). By 1994, MTF had added $1.3 billion in losses to the $3 billion of JUA losses. Enter, the 1994 Good Driver Protection Act, N.J.S.A. 34:1B–21.1 *et seq.* That act reintroduced the high-risk pool concept for consumers otherwise excluded from the automobile insurance marketplace. It provided for tightened State controls over the insolvent MTF, and for finally burying JUA. Funding was cobbled together to close down both JUA and MTF in a manner that would settle litigation.[12] That litigation was spawned when the member-insurers attributed losses for which they would be responsible in MTF,

---

9. *New Jersey v. Bigham,* 119 N.J. 646, 652, 575 A.2d 868 (1990).

10. N.J.S.A. 17:29A–35(c).

11. N.J.S.A. 17:30E–7(e). A detailed review of the form of JUA and MTF policies was conducted by this court; no reference can be found in the policy texts to State responsibility for claims nor that the issuer is part of State government.

12. *In the Matter of the Comm'r of Ins.'s March 24, 1992 Order,* 132 N.J. 209, 624 A.2d 565 (1993).

to the Commissioner of Insurance. Detailed history of the JUA–MTF era is readily available.[13]

In the relevant period beginning before the 1982 legislation and running through today, the evolution of surcharging in New Jersey by automobile insurers and DMV can be traced as follows:

- New Jersey adopted compulsory automobile liability insurance in the New Jersey Automobile Reparation Reform Act effective January 1, 1973. N.J.S.A. 39:6A–1 *et seq.*

- Compulsory automobile insurance before the 1982 Reform Act featured the Assigned Risk Plan, "often the only available insurance for statistically categorized 'high risk' drivers," or "residual market insureds," who were frequently charged "abnormally high rates." *Bigham,* 119 N.J. at 652, 575 A.2d 868.

- Through 1982, drivers in the voluntary and residual markets were subject to premium surcharges levied by each insurer. The State did not levy "surcharges" for motor vehicle infractions, but rather imposed criminal penalties, in the form of fines, points, license suspension, revocation, and imprisonment. *In re Marcucci,* 256 B.R. at 689. Insurers surcharged, for example, the drunk driver as compensation for the added risk of insuring that driver. *Id.* These and other surcharges in both the voluntary and residual market (for violating an array of motor vehicle laws) were *ad hoc,* based on company-set rating, "driver classification or geographical location," so that two drivers charged with the same violation in different New Jersey locales might be assessed different surcharges. *Bigham,* 119 N.J. at 652, 575 A.2d 868.

- The 1982 Reform Act replaced the Assigned Risk Plan with JUA. Premium rates in JUA were to be comparable to those in the voluntary market. N.J.S.A. 17:29A33; *Senate Labor, Industry and Professions Committee Statement,* Assembly, 1696–L.1983, c. 65 (N.J.1983) ("Committee Statement"). A key component of the 1982 reforms was its Merit Rating Plan ("MRP").

- Through the MRP, the Legislature replicated the private market by culling out *certain* DMV violations to create "surcharges" to fund, in part, JUA. N.J.S.A. 17:29–35b. These specific surcharges, after 1982, were removed from the private market, such surcharging by private insurers being preempted. N.J.S.A. 17:29–35c.[14]

---

**13.** *In re Marcucci,* 256 B.R. at 689–93 (D.N.J. 2000) (*quoting* Judge Burns' decision below). *See also In re Kish (Kish III),* 238 B.R. at 278–80; *In re Adams,* 106 B.R. at 818; *In re Christensen,* 95 B.R. at 891–93 (Bankr.D.N.J. 1988); *State Farm Mutual Auto. Ins. Co. v. N.J.,* 124 N.J. 32, 40–44, 590 A.2d 191 (1991); *Bigham,* 119 N.J. at 652–55, 575 A.2d 868; *Affiliated FM Ins. Co.,* 338 N.J.Super. 540, 545–49, 770 A.2d 741 (App.Div.2001).

**14.** *Accident* surcharging, N.J.S.A. 17:29A–35a, now deleted in favor of a regulated uniform eligibility point program, and that point program, N.J.S.A. 17:33B–14, had/have obvious rate implications. However, drunk driving, refusing chemical testing, and accumulation of six or more motor vehicle points, as well as certain nonpoint violations including driving without a license, driving while suspended and failing to maintain liability insurance, N.J.A.C. 13:19–13.1, per N.J.S.A. 17:29–35b(3), are DMV surcharge generators. N.J.S.A. 17:29–35b(1) and (2). Surcharges may not be levied by private insurers for these infractions. Note that insurance surcharges as previously imposed applied to insurance premiums; DMV surcharges from and after 1984, have applied to *licensed drivers* (as distinguished from insured vehicle owners). *In re Lugo,* 94 B.R. 335, 337 (D.N.J.) ("the [MRP] surcharge is imposed on all drivers

• By adapting a private sector funding scheme to JUA's needs, the MRP both helped finance JUA and furthered the legislative goal of uniformity in surcharging. *Clark v. New Jersey Div. of Motor Vehicles,* 211 N.J.Super. 708, 710, 512 A.2d 588 (App.Div.1986) ("The Merit Rating Plan merely gives the Division of Motor Vehicles the responsibility of assessing surcharges for high risk drivers in a uniform manner"). *See* Karcher, *Overview of No Fault Auto Insurance, 111 New Jersey Lawyer: Journal of the New Jersey State Bar Association,* 9 (May 1985) ("It should be noted that the Reform Act does not create new surcharges for motor vehicle convictions and accidents; it reforms the surcharge system previously used by the insurance companies"), cited in *Bigham,* 119 N.J. at 654, 575 A.2d 868.

• The Commissioner of Insurance, *not the Director of DMV,* has from the outset and remains the authorized official who may increase motor vehicle surcharge amounts on convictions, impose surcharges for motor vehicle offenses which do not result in points on a driver's license, and reduce the number of points for which surcharges may be imposed. N.J.S.A. 17:29A–35b(3). The Commissioner shall nonetheless "consult" with the Director of DMV. *Id.*

• When MTF was created in 1990, a funding mechanism was established to help phase out JUA (and later MTF). That was the Guaranty Fund per N.J.S.A. 17:33B–5a. The same DMV surcharges collected under N.J.S.A. 17:29A–35b, as well as monies from

other sources, were to be deposited into the Guaranty Fund to be used initially to pay JUA debt. N.J.S.A. 17:33B–5b. The DMV surcharge scheme, N.J.S.A. 17:29A–35b, was amended to allow the surcharges to be distributed as required by the 1990 Act. At the same time, a pre-existing *private* funding mechanism, the Property Liability Insurance Guaranty Association ("PLIGA") and its member-contributed bailout fund for insurer insolvency, was called into play. PLIGA, N.J.S.A. 17:30A–1 *et seq.,* was compelled to make loans to the Guaranty Fund, initially for JUA debt, at the rate of $160 million per year from 1990 through December 31, 1997. N.J.S.A. 17:30A–8a(9) and (10). (PLIGA was established effective April 11, 1974 to pay claims of insolvent carriers and for other related purposes associated with insurer insolvency. N.J.S.A. 17:30A–2(a).)

• "Throughout the history of the amendments to the New Jersey Merit Rating Plan the reasons for the imposition of the motor vehicle surcharges have not changed nor has the purpose." *In re Marcucci,* 256 B.R. at 692, *citing McGarrah v. New Jersey,* 268 N.J.Super. 577, 581, 634 A.2d 139 (App.Div.) ("The insurance surcharges imposed pursuant to N.J.S.A. 17:29A–35(b) are modeled on those previously assessed by the private insurance industry"), *certif. den.,* 135 N.J. 469, 640 A.2d 850 (1994).

• When the Legislature adopted the 1994 Good Driver Protection Act ("GDPA"), N.J.S.A. 34:1B–21.1, *et seq.,* it provided MTF deficit funding on a

who are convicted of driving while intoxicated, including those who own no car"), *aff'd,* 886 F.2d 602 (3d Cir.1989); *In re Bill,* 90 B.R. 651, 654–55 (Bankr.D.N.J.1988) (DMV

surcharges *"are imposed on the driver even if he or she does not own a vehicle "*) (emphasis in original).

bulk and immediately available basis through New Jersey Economic Development Authority ("EDA") bonds. DMV surcharges were simply redirected to service the bond debt, a concomitant to the use of the immediately available bond proceeds to pay MTF debt.[15] The bond mechanism was adopted after member insurers in MTF resisted a cash call order issued by the Commissioner of Insurance in December 1993 to meet MTF losses. *Affiliated FM Ins. Co. v. New Jersey,* 338 N.J.Super. 540, 553–54, 770 A.2d 741 (App.Div.2001). To avert extended litigation the Governor and the insurers entered into a settlement which GDPA implements. N.J.S.A. 34:1B–21.1 (Senate Committee Statement No. 1250–L.1994, c. 57); N.J.S.A. 34:1B–21.2b c. The GDPA empowered the EDA "to issue Market Transition Facility bonds ... for the purpose of providing funds for the payment of the current and anticipated liabilities and expenses of [MTF]...." N.J.S.A. 34:1B–21.4. These bonds are not the general obligation of the State, nor "a

debt ... of the State or any agency or instrumentality thereof...." N.J.S.A. 34:1B–21.9.

- N.J.S.A. 17:29A–35b(2) now provides that essentially all of the surcharges billed and collected by DMV[16] be deposited into the "Division of Motor Vehicles Surcharge Fund" for transfer upon appropriation[17] into the "Market Transition Facility Revenue Fund" (diverted as of 1994 from the persisting Guaranty Fund) to service the MTF bonds issued by EDA under N.J.S.A. 34:1B–21.4, until the bond debt is discharged. In fact, the MTF Revenue Fund (made up principally of DMV surcharges) secures the bonds. N.J.S.A. 34:1B–21.4.

- In redirecting the DMV surcharges to pay the MTF bonds, the Legislature relegated repayment of the PLIGA loans to a date uncertain, following repayment of the bonds.[18] N.J.S.A. 17:29A–35b was amended to require that surcharges be applied to the PLIGA loans only after JUA obligations and MTF bond obligations were paid. N.J.S.A. 17:29A–35b(2). Annual sur-

15. Commencing on September 1, 1996, or such earlier time as the Commissioner of Banking and Insurance shall certify to the State Treasurer that amounts on deposit in the New Jersey Automobile Insurance Guaranty Fund are sufficient to satisfy the current and anticipated financial obligations of [JUA], all plan surcharges collected by the Division of Motor Vehicles ... shall be remitted to the Division of Motor Vehicles Surcharge Fund for transfer to the Market Transition Facility Revenue Fund, ... until such a time as all the Market Transition Facility bonds, notes and obligations ... and the costs thereof are discharged and no longer outstanding. [N.J.S.A. 17:29A–35b(2).]

16. The ten-percent retention for administrative expenses and the five-percent retention for the expense of maintaining the cancellation notification system were eliminated after August 31, 1996. N.J.S.A. 17:29A–35b(2).

17. The State relies heavily on this annual appropriation requirement to support its position that DMV surcharges are for the benefit of the State. Nevertheless, the State acknowledges the extremely negative impact that failure to appropriate these committed funds would have on future EDA bond issues. Of course, the Legislature has consistently honored the State's more than tacit earmarking of the DMV surcharge collections. *See* N.J.S.A. 34:1B–21.10 ("State pledge regarding bonds and notes"); N.J.S.A. 34:1B–21.4 ("The bonds and notes shall be secured wholly or in part by the monies in the Market Transition Facility Fund.").

18. *Affiliated FM Ins. Co.,* 338 N.J.Super. at 556–62, 770 A.2d 741.

pluses in the MTF Revenue Fund have developed and have been remitted, not to PLIGA, but to the General Fund of the State.[19]

The dischargeability in bankruptcy of DMV surcharges is thus knotted with the complexity of the State's generation-long automobile insurance dilemma. Availability of market rate coverage was denied a growing portion of the population when remedial efforts were first undertaken. Those efforts failed in two principal ways: readily available coverage in the marketplace (at affordable rates) remains an unachieved goal; *and,* the two entities formed by legislation to address the dilemma, JUA as the first final solution, and MTF as a stopgap to disengage from JUA's failure, developed operating deficits of billions of dollars. Hence, the *market* problems have been compounded by *insurance entity insolvency* mechanics and funding needs.

### DISCHARGE LINKED TO THE IN-TERTWINED PROBLEMS OF MARKET AVAILABILITY AND IN-SURER INSOLVENCY; PRE EX-ISTING LEGISLATION

The long litigation history of these surcharge/discharge questions is characterized by detailed inspection of immediately underlying legislation and the resulting automobile insurance entities. Yet, notwithstanding the need for very focused inquiry into the historical development, effect and intricacies of JUA and MTF, examination of parallel material should not be ignored. Indeed, at least one model for JUA and MTF was extant in New Jersey at the time JUA was conceived to solve *market availability* problems. Moreover, established *insurance entity insolvency* mechanisms persisted here long before the JUA-MTF financial disaster manifested. It was in the context of existing statutory structures, dealing with both availability of necessary insurance markets and insolvency of insurers, that the JUA-MTF programs were crafted. *See, e.g.,* N.J.S.A. 17:29A-1 *et seq.,* 17:30A-1 *et seq.,* 17:30B-1 *et seq.,* 17:30C-1 *et seq.* and 17:37A-1 *et seq.*

In 1968 the New Jersey Insurance Underwriting Association (the "NJIUA") was created. N.J.S.A. 17:37A-1 *et seq.* Following the civil disorders of 1967, fire and extended coverage insurance could not be purchased in the open market in many urban areas throughout the country. Taking the lead from a federal initiative, New Jersey established the NJIUA as an amalgam, *i.e.,* a joint underwriting association of all insurers writing fire and extended coverage insurance in the State. N.J.S.A. 17:37A-3. The federal program[20] offered participating private insurers certain benefits (the purchase of federal riot reinsurance). COUCH (with emphasis added and certain footnotes omitted) describes the federal act as follows:

> The *Fair Access to Insurance Requirements Act (FAIR)* was created as a response to the growing unavailability of insurance in urban areas following the riots of the late 1960s. The Act was designed "to make property insurance more readily available, particularly in

---

**19.** Again, the State argues that this ultimate remittance (at its maximum less than half of annual surcharge appropriations) supports its State benefit contention (*see* N.J.S.A. 34:1B-21.7(b)). However, as will be seen, the existence of such annual surpluses is speculative (indeed, unpredictable) and could well be subject to other calls.

**20.** The federal program was embodied in 12 U.S.C.A. § 1749bbb *et seq.* (1968). *See generally* CONF. REP No. 90-1785 (July 23, 1968), 1968 U.S.C.C.A.N. 3053, 3064; H.R.REP. No. 90-1585 (1968), U.S.Code Cong. & Admin.News 1968, 2873; 1 COUCH ON INSURANCE 4.6 (3d Ed.)("COUCH").

urban areas, and to provide reinsurance against riot and civil commotion losses to insurance companies." [FN68] The Act essentially *"created a bilateral contract between the United States and the private insurance sector"* by which insurance carriers could purchase federal riot reinsurance if they would "develop and participate in urban area insurance pools in a bona fide attempt to solve the deficiencies within the property insurance market." [FN69] Under the Act, each insurance company receiving reinsurance is required to cooperate with the state insurance authority in which it acquires such reinsurance in establishing and carrying out statewide plans to assure fair access to insurance requirements (FAIR plans).[FN70]

[FN68] *Wells v. Missouri Property Ins. Placement Facility*, 653 S.W.2d 207 (Mo. 1983).

[FN69] *Id.*

[FN70] 12 U.S.C.A. § 1749bbb–3(a).

*Id.* at § 4.6.

H.R.REP. No. 90–1585 (1968), U.S.Code Cong. & Admin.News 1968, 2873, in its "Findings and Declaration of Purpose," confirms that, as with the federal-private insurance sector contract, the relationship at the state level was likewise to be a state-private insurance industry compact.

> *[I]t is the purpose of the title to assist State insurance authorities and the private insurance industry in the development of statewide programs* to increase the availability of necessary property insurance coverage against fire, crime, and other perils for property meeting reasonable underwriting standards, . . .

*Id.* at 2953 (emphasis added). The program, as conceived

> would require *every insurer* reinsured by the Secretary to cooperate with the State insurance authority, in each State in which it acquires reinsurance, in es-

tablishing and carrying out statewide plans to assure fair access to insurance requirements (FAIR plans).

*Id.* at 2956. The interplay of state regulation and industry expertise was to be exploited as follows:

> The statewide FAIR plans represent a substantial expansion of the urban area plans developed by the insurance industry and State insurance authorities to induce greater writing of insurance in urban core areas . . . Experience with urban area plans demonstrates their promise, and the FAIR plan is designed to fulfill that promise and secure for all property owners equitable access to basic lines of property insurance *by giving the insurance industry the responsibility for locating insurance for the owner of insurable property.*

*Id.* at 2957 (emphasis added). *See generally Wells v. Missouri Prop. Ins. Placement Facility*, 653 S.W.2d at 211–12.

Nothing in the makeup of the New Jersey FAIR plan indicates a change in the federally contemplated state-private insurance industry program. The "Legislative declaration" of N.J.S.A. 17:37A–1 provides for mandatory industry participation (through the joint underwriting association, NJIUA), as follows:

> [W]hile the need for such insurance is growing there is reason to believe that the market for same is constricting, and likely to become more constricted in the future; that voluntary efforts to provide fire and extended coverage insurance in areas likely to be unprofitable deserve praise, but are insufficient to meet the needs of these areas; *that the State has an obligation to require every insurance company writing fire and extended coverage insurance in New Jersey to meet its public responsibilities*, instead of shifting the entire burden to a few pub-

lic spirited companies; that it is the purpose of this act to accept this obligation; and that any mandatory program to provide fire and extended coverage insurance for all citizens of New Jersey should be supervised by the Commissioner.... [Emphasis added.]

This background, and the limited case law dealing with NJIUA, give no indication that the regulated and statutorily created association would ever be considered "governmental." *See New Jersey Ins. Underwriting Ass'n v. Clifford,* 112 N.J.Super. 195, 270 A.2d 723 (App.Div.1970).

Like both the after-developed JUA and MTF, NJIUA was the issuer of insurance policies. N.J.S.A. 17A:37A-4. It operated—and to this day continues to operate—as an insurer of last resort. Its twenty-one-member board includes ten elected by the insurer members, two industry officers appointed by the Commissioner of Insurance, six public members appointed by the Commissioner, and three nonvoting members. N.J.S.A. 17:37A-5. Potential losses in the association are backed up by the "New Jersey Insurance Development Fund," a repository of *surcharges* on all property insurance policies written in the State. A fail-safe State appropriation (subject to later recoupment) further assures its solvency. *See* N.J.S.A. 17:37A-18 through 23. Nevertheless, "[a]ll members of the association shall participate in its writings, expenses, *profits and losses.* ..." N.J.S.A. 17:37A-6 (emphasis added). The enabling legislation does not indicate that NJIUA is subject to taxation under N.J.S.A. 54:18A-1 *et seq.* ("Taxation of ... Unincorporated Associations Transact-

ing Insurance Business"), though no exemption can be assumed.[21] NJIUA, quietly successful over a long period, appears to be the logical model for the JUA–MTF programs in terms of maintaining insurance market availability.[22]

In terms of pre-existing insurer insolvency mechanisms, note both the "Special Joint Underwriting Association" of N.J.S.A. 17:30B-1, a *potential* facility for dealing with insurance insolvencies, and the parallel *permanent* mechanism of PLIGA of N.J.S.A. 17:30A-1 *et seq.* Since 1974, the Commissioner of Insurance has been authorized to form "one or more associations to assume the unexpired policy obligations of insolvent insurance companies ... [consisting] of all insurers authorized to write ... the same kind of direct insurance...." N.J.S.A. 17:30B-4. These Special Joint Underwriting Associations, if and when created, are *not* to issue policies. Rather, they are to manage the windup of insurance affairs of an insolvent insurer by, among other things, assuming unexpired insurance obligations of insolvent companies and presenting claims for unearned premiums on assumed policies to PLIGA. N.J.S.A. 17:30B5(a) and (d). Each association must present a plan of operation to the Commissioner, and fund the approved plan through a "Joint Underwriting Association Fund" developed from the imposition of like-policy *surcharges.* N.J.S.A. 17:30B-7 through 10. Funds remaining after liquidation are to be paid over to PLIGA (N.J.S.A.17:30B-10(d)). These special associations are to have broad immunity from liability (N.J.S.A.17:30B-4), and are specifically ex-

---

21. JUA's responsibility for N.J.S.A. 54:18A-1 *et seq.* premium taxes has persisted. N.J.S.A. 17:30E-22. When MTF was created in 1990, the Legislature specifically provided for taxation of the entity pursuant to the same premium tax statute. N.J.S.A.17:33B-11(e).

22. The generations of policies issued by NJIUA do not seem to have actually exposed the State's General Fund, notwithstanding the existence of a guaranty fund and the support of a State appropriation. N.J.S.A. 17:37A-23.

empted from State taxation (N.J.S.A.17:30B–10(e)). Yet their fundamental makeup of private insurer members establishes a template for using the private but regulated marketplace to "cover" private insurer insolvency problems. Whether such associations, if formed, would be deemed "private" or "public" is subject to debate. However, such associations are in no sense "governmental." In its liquidation phase, MTF reflects the makeup of a N.J.S.A.17:30B–1 Special Joint Underwriting Association.

PLIGA, as set forth earlier, is the claims payment mechanism for certain insurance coverages where insurers are insolvent. N.J.S.A. 17:30A–2. It is "a *private*, nonprofit, unincorporated, legal entity" comprised of all New Jersey licensed insurers who write insurance of the specified kinds. N.J.S.A. 17:30A–6 and 5(f) (emphasis added). This *persisting* entity (unlike the temporary mechanism of the "Special Joint Underwriting Association") has a board of directors of not less than five nor more than nine members, two of whom are appointed by the Commissioner of Insurance (from among the officers of insurers). "The remaining members of the board shall be selected by member insurers *subject to the approval of the commissioner* " (emphasis added). N.J.S.A. 17:30A–7(a). As with the special associations, PLIGA does not issue policies. However, PLIGA will be "deemed the insurer" to the extent of obligations on covered claims (N.J.S.A.17:30A–8(a)(2)), and may assess its members "amounts necessary to pay" both claims and expenses (N.J.S.A.17:30A–8(a)(3)). It may, among other things, examine insurers to determine financial condition (N.J.S.A.17:30A–13), and, even though a private entity, PLIGA *has broad immunity (N.J.S.A.17:30A–17), and is exempt from State taxation (N.J.S.A.17:30A–15)*. MTF and PLIGA intersect: PLIGA is reflected to a degree in the formulation of MTF as a workout entity; and, PLIGA has loaned over $1 billion to fund part of JUA's and then MTF's debt. N.J.S.A. 17:30A–8(a)(10).

Historically, given that insurance is an area of commerce relegated to the states for regulation,[23] efforts at uniformity in regulation have been ongoing. The Uniform Insurers Liquidation Act and its predecessor acts have persisted in New Jersey since 1902. The current version is a 1975 adaptation. N.J.S.A. 17:30C–1 *et seq.* The Commissioner of Insurance is to serve as liquidator of insolvent insurers under the Act. Citing mixed precedent as to whether the Commissioner is functioning as a "private" fiduciary or as a public official, when serving as a liquidator, the Supreme Court of New Jersey views the Commissioner as being in "a hybrid status, part public and part private, when he or she oversees the liquidation of an insolvent insurer." *In the Matter of the Liquidation of Integrity Insurance Company,* 165 N.J. 75, 91, 754 A.2d 1177 (2000). Significantly, statutory liquidation of MTF under the auspices of the Commissioner of Insurance (*i.e.,* per N.J.S.A. 17:30C–1 *et seq.*) was rejected in 1994 in favor of alternative liquidation mechanics and bond funding of MTF debt.[24]

**23.** *Consider U.S. v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), as superseded by the *McCarran–Ferguson Act,* 15 U.S.C. § 1101 *et seq.*

**24.** "Legislative findings and declaration" for the 1994 Reform Act includes the following:

*In its present financial condition, it is likely that the facility would be declared financially impaired or insolvent under the provisions of [N.J.S.A. 17:30C–1 et seq.].* Because of the interim nature of the facility, however, initiating proceedings under that law is not in the best interests of the facility's policyholders and other claimants under the policies

## JUA AND MTF IN HISTORICAL CONTEXT

### JUA at Origin

Against the background of (i) NJIUA, opening markets through the joint association of private insurers, and (ii) the insolvency protection mechanisms of both the "Special Joint Insurance Underwriting Association" and PLIGA, as well as the Uniform Insurers Liquidation Act, JUA and MTF were hatched. Clearly, JUA was created through 1982 legislation to open the automobile insurance market, *i.e.*, "to assure the New Jersey insurance consumer full access to automobile coverage through normal market outlets...." N.J.S.A. 17:30E–2. This common form joint underwriting association followed the earlier NJIUA model (ongoing for fifteen years when JUA was established) *as an insurer* (N.J.S.A.17:30E–7(e)). And, like NJIUA, JUA had its origins in and drew its membership from the highly regulated yet private insurance marketplace. Its mandatory membership, all of the State's automobile liability insurance insurers (N.J.S.A.17:30E–4), akin to NJIUA's industry sector membership, tends to cast JUA as a private or otherwise nongovernmental enterprise. This is the case even though JUA's board included appointees of the governor, the speaker of the assembly and the president of the senate. N.J.S.A. 17:30E–5(a). JUA's initial funding, including claim and expense funding, was made up of net premiums earned, accident surcharges as permitted, the DMV surcharges here at issue, "residual market equalization charges" collected by members (in effect, a surcharge on premiums for all policies issued by the members, as regulated by the Commissioner of Insurance), and other sources. N.J.S.A. 17:30E–8(a). JUA's funding was not so different from that of NJIUA. Moreover, JUA was subject to taxes per N.J.S.A. 54:18A–1 *et seq. See* N.J.S.A. 17:30E–22.[25] Yet, a noteworthy difference between NJIUA and JUA is the failure of JUA's original statutory structure to indicate attribution of losses to its members. (Of course, as conceived, there were to be no JUA losses.)

### MTF at Origin

By 1990, the Fair Automobile Insurance Reform Act (N.J.S.A.17:33B–1 *et seq.*, creating MTF), was tacked onto the failed New Jersey Automobile Full Insurance Availability Act (N.J.S.A.17:30E–1 *et seq.*, the origin of JUA); *availability* of coverage and *insolvency* of the 1982 purported solution to open-market problems became intertwined dilemmas. The market had to be kept open, while an accumulated JUA debt of over $3 billion had to be faced. MTF, though intended to be transitory, took on many of the entity characteristics of JUA and was in keeping with the NJIUA model during its policy-issuing period. The main MTF function, initially, like JUA, was to *issue insurance policies* (N.J.S.A.17:33B–11(c)), and the losses attributable to its operation were to fall on the same insurer-members. N.J.S.A.17:33B–11(a) and (d). On the other hand, MTF was required to "depopu-

---

written by it. Because of this, and given the cost of pursuing protracted litigation with member insurers over this issue, it is deemed to be in the public interest to find a means of providing the necessary money to pay the claims now pending against the facility in the most expeditious manner possible.

N.J.S.A. 34:1B–21.3(c) (emphasis added). A clear implication here is that MTF was thought to be subject to the standard (indeed, uniform law prescribed) liquidation procedure applicable to all private insurers.

**25.** *Compare* N.J.S.A. 17:33B–11(e), specifying that MTF was subject to the tax. As stated earlier, there is no reason to believe that NJIUA is exempt from these taxes.

late" (N.J.S.A.17:33B–11(c)(5)). At the same time and during the transitional life of MTF, the 1990 law provided for the appointment of a trustee for the insolvent JUA (N.J.S.A.17:33B–3), deferral of payment on JUA claims (N.J.S.A.17:33B–4), and the creation of a fund (New Jersey Automobile Insurance Guarantee Fund per N.J.S.A.17:33B–5), to pay the huge JUA debt. These changes were plainly insolvency driven, using a variety of funding sources to bail out, by 1990, a gargantuan JUA obligation. Thus, before its own insolvency, MTF's transitory nature was in keeping with the concept of winding up insolvent insurer affairs (*i.e.* those of JUA), as fostered more generally by N.J.S.A.17:30A–1 *et seq.* and N.J.S.A.17:30B–1 *et seq.* through PLIGA or a Special Joint Underwriting Association.

### GUARANTY FUND AS AFFECTING JUA AND MTF

It is emphasized that a significant aspect of the 1990 Reform Act was the creation of the Guaranty Fund (N.J.S.A.17:33B–5).

The bill establishes the New Jersey Automobile Insurance Guaranty Fund which is to be administered pursuant to a plan of operation approved by the commissioner. Direct responsibility for administration of the plan will be placed with an insolvency trustee appointed by the commissioner. The trustee is to be a person with experience in bankruptcy or insolvency who is not, during his tenure as trustee, to be affiliated with or employed by an insurer. Monies from the fund are to be used to pay claims and satisfy the other financial obligations of the JUA. In order to disburse monies from the fund, the trustee will prepare a written application for disbursement which is to be approved by the commissioner and forwarded to the State Treasurer for approval, at which time the requested monies are to be disbursed. The plan of operation is to provide for the payment of covered losses on behalf of the association and is to contain a schedule for the prioritization of claims payments by the type of claim for which payment is due. The schedule may provide for the deferral of [certain claims].... [Assembly Committee Statement following N.J.S.A. 17:33B–1.]

Such guaranty funds, often made up of private industry contributions, were developed in the era that spawned New Jersey's PLIGA. *See Greenfield v. The Pennsylvania Ins. Guar. Ass'n,* 24 Pa.Cmwlth. 127, 353 A.2d 918 (1976). *See also Kuvin, Klingensmith & Lewis, P.A. v. Florida Ins. Guar. Ass'n, Inc.,* 371 So.2d 214 (D.Ct. of App. Fla.1979). The purpose of these funds was to protect insurance consumers against the displacement and loss which could be occasioned by insurer insolvency.

As set forth earlier, the pace-setting NJIUA had two fallback funding mechanisms in place before the PLIGA era. Since 1968, New Jersey's FAIR plan has been protected by the New Jersey Insurance Development Fund (a repository for *surcharges* on all property insurance policies written in the State), *as well as* a statutory assurance of State-appropriated funding (subject to later recoupment). N.J.S.A. 17:37A–18 through 23.

Unlike the NJIUA fail-safe system and PLIGA, both of which were established *before* the fact of any insolvency, the Guaranty Fund was put in place *after* the all too-well-known failure of JUA. It was a State-prescribed composition, tapping a broad array of sources.

In addition to monies appropriated or otherwise made available to the fund or the JUA, the fund will obtain income from various sources, including: *loans*

*made by the New Jersey Property Liability Guaranty Association in an amount of $160 million a year for each calendar year from 1990 through 1997,* funds for these loans are to be raised through assessments on member insurers of the association; loans from other sources approved by the commissioner; revenues from a surtax imposed on private passenger automobile insurance premiums in this State, other than those collected by the JUA and the Market Transition Facility, in calendar years 1990 through 1992, the surtax rate is set at 5%, but the Director of Taxation, in consultation with the commissioner, is authorized to adjust the surtax rate so that total revenue over the three years approximately equals $300 million; revenues from the premium tax collected on JUA premiums; monies from the New Jersey Merit Rating Plan collected on or after October 1, 1991, less 15% or the actual administrative expenses incurred by the Division of Motor Vehicles, whichever is less, for collecting merit rating surcharges and administering the motor vehicle liability insurance cancellation notification system; monies from a $100 annual fee placed on attorneys, medical doctors, doctors of osteopathy, chiropractors, podiatrists, physical therapists and auto body repair shops, these fees are to be collected by the appropriate licensing body for calendar years 1990 through 1996; and monies collected by the Division of Motor Vehicles, on or after October 1, 1991, on additional registration fees imposed on all motor vehicle registrations issued or renewed in this State from July 1, 1990 through December 31, 1996. . . .

Assembly Committee Statement following N.J.S.A. 17:33B–1. (Emphasis added.)

The PLIGA loans ($160 million per year for eight years) comprised the largest discernible single source for the Guaranty Fund (as of 1990). A surtax on automobile insurance premiums (*paid for exclusively by the industry* ) was to raise another $300 million over three years. Aspects of these two revenue sources were (as of 1990) conceived of by the Legislature as follows:

> Member insurers of the New Jersey Property Liability Guaranty Association are precluded from imposing a surcharge on the premiums of any policy to recoup the assessments imposed for the purposes of the loans made by the association. The bill also provides that, upon certification by the commissioner that monies collected under the New Jersey Merit Rating Plan [*i.e.* DMV surcharges] are no longer necessary to fund the JUA debt, those monies be forwarded to the New Jersey Property Liability Guaranty Fund to aid in payment of loans made by that fund to the New Jersey Automobile Insurance Guaranty Fund. In addition, the bill provides that the Commissioner of Insurance is to take such action as is necessary to ensure that private passenger automobile insurance policyholders do not pay for the surtax imposed on automobile insurers to help defray the JUA debt.

*Id.*

MTF's utter failure (losses exceeding $1 billion in its two years of operation), was insult to JUA injury; the earlier referenced litigation between MTF insurer-members and the Commissioner[26] generated a settlement which was implemented in 1994 by GDPA. N.J.S.A. 34:1B–21.1 *et seq.* With revenue sources for the Guar-

---

**26.** In the *Matter of the Comm'r of Ins.'s March 24, 1992 Order,* 132 N.J. 209, 624 A.2d 565 (1993).

anty Fund drying up, and with expanded JUA MTF debt, the Commissioner was authorized to take more direct control of the MTF. *See generally* N.J.S.A. 34:1B–21.2. This was the clearly stated alternative to the appointment of a liquidating trustee (*i.e.,* the Commissioner), and the use of long-standing statutory insolvency provisions. N.J.S.A. 34:1B–21.2(c). Funding was once more assembled, this time to pay the MTF deficit. The members were to pay their apportioned debt as of 1994 ("capped" at $439 million). (It is not clear whether this payment went into the Guaranty Fund or directly to MTF operations for loss coverage.) PLIGA was again tapped, its 1996 and 1997 loans ($320 million) to the Guaranty Fund now redirected to MTF debt. EDA bonds were to issue ($665 million) beginning in 1996 *and* were to be repaid by DMV surcharges (now *removed* from the Guaranty Fund and redirected to bond debt service) at the rate of $85 million per year.[27] Other funding sources were also identified. *See* "Statement" following N.J.S.A. 34:1B–21.1; 17:29A–35(b)(2); 17:30A–8(a)(10); 17:33B–5(d) and 17:33B–11(d).

### SUMMARY OF JUA/MTF HISTORICAL DEVELOPMENT AS CONTEXT FOR "GOVERNMENTAL UNIT" DETERMINATION

The historical context and development of JUA and MTF thus reflect the following:

- NJIUA and the counterpart national FAIR plan program established a model for government-industry market-opening efforts, later emulated in New Jersey by JUA;

- Insurer insolvency, the subject for state regulation for a century, and another area of government-industry cooperation, includes the oversight of insurer liquidation by state commissioners serving as trustees, as well as the use of industry facilities and funding to maintain market stability by protecting insureds and claimants;

- Guaranty funding to protect the public against insurer insolvency losses was established through private industry sources (*e.g.,* PLIGA), or mixed private-state generated sources (*e.g.,* NJIUA's premium surcharge repository, the New Jersey Insurance Development Fund, *along with* the State-appropriated standby fund, N.J.S.A. 17:37A–18 through 23);

- JUA's enormous failure was initially to be remedied with a trusteeship, a mixed source fund to cover losses, and a replacement facility to handle transition out of JUA and its remaining claims administration (*i.e.,* MTF);

- MTF operated as the rough equivalent of a statutory Special Joint Underwriting Association, transitory in nature and reliant on private industry members to wind up the insurance business affairs of JUA;

- MTF, unable to issue policies in transition and take over claims administration from JUA without amassing new overwhelming debt (which could not be satisfied out of the mixed-source Guaranty Fund), was then bailed out with the MTF bond issue; and

- Throughout the generation of JUA–MTF operation and after life, the DMV surcharges have been operative. They were initially taken from the private marketplace to subsidize JUA's higher risk insurance business, then

---

**27.** The same surcharges were being applied to the JUA debt through August 1996. *See* "Statement" following N.J.S.A. 34:1B–21.1.

were used to fund JUA's post 1990 liquidation and transition to and through MTF. After 1994, the surcharges became the sole source of service of MTF bonds, and will in the future fund repayment of more than $1 billion of PLIGA loans.

Against this background, two tests will be applied to evaluate the status of MTF (and, along the way, JUA). The first is the Eleventh Amendment multi-part test for "arm of the State," well-defined in this circuit. Then, the legislative history of the 11 U.S.C. § 101(27) "governmental unit" definition will be examined for interpretive clues. Specific contentions of the State will be reviewed (*i.e.,* that EDA, not MTF, is the surcharge beneficiary, and that certain aspects of the flow of surcharges evidence benefit to the State). Finally, determination of the "governmental unit" issue will be measured against both federal court reluctance to impede necessary state policing functions, and the bankruptcy court's duty to promote fundamental bankruptcy policy.

## THE SOVEREIGN IMMUNITY TEST AS APPLIED TO JUA–MTF

*Kish III,* 221 B.R. at 125–31, applied this circuit's Eleventh Amendment test to both JUA and MTF.[28] Unlike the case at

bar, the State did not waive sovereign immunity in *Kish III.*

The *Christy* test as recited in *Kish III* (221 B.R. at 125, with references to 54 F.3d at 1144) is as follows:

> The Third Circuit has set forth a three-part test for determining whether a state agency is an arm or alter ego of the state for the purposes of the Eleventh Amendment. . . .
>
> The initial part of the test inquires "whether, in the event the plaintiff prevails, the payment of the judgment would come from the state." *Id.* (citing *Peters v. Delaware River Port Authority,* 16 F.3d 1346, 1350 (3d Cir.1994)). "[T]his includes three considerations: whether the payment will come from the state's treasury, whether the agency has sufficient funds to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts." *Id.* The second part of the test considers "the status of the agency under state law (this includes four considerations: how the state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own name, and whether it is immune from state taxation)." *Id.* The

---

28. *Kish III* analyzed JUA and MTF for sovereign immunity purposes and concluded that JUA is an "arm of the State," but MTF is not. 221 B.R. at 131. The test set forth in *Christy,* 54 F.3d at 1144, was employed by the Bankruptcy Court. This approach, diligently undertaken, began with the question: "whether a *state agency* is an arm or alter ego of the State for purposes of the Eleventh Amendment." 221 B.R. at 125 (emphasis added). In *Christy,* that starting point was clear, given that the Pennsylvania Turnpike Commission was the subject. *Sub judice,* insurers and an insurer liquidating facility are hardly comparable to a public roadway authority in terms of traditional state governance. Thus, there could well be more of a threshold issue here

as to how New Jersey (*not this court*) views the *functions* of JUA–MTF. And, while it is emphasized that *Kish III* was not defining "governmental unit," the statutory term embodied in 11 U.S.C. §§ 101(27) and 523(a)(7), there is an intersection of the Bankruptcy Code term and Eleventh Amendment *alter ego* definitional issues at 11 U.S.C. § 106, which purports to abrogate sovereign immunity in certain respects "as to a *governmental unit.*" Clearly, the underlying purposes for the Eleventh Amendment emanate from federal-state relational history quite apart from bankruptcy. Yet, the Bankruptcy Code's broad use of "governmental unit" impels this court to apply the Eleventh Amendment test in this 523(a)(7) exception to discharge setting.

final part of the test evaluates "what degree of autonomy the agency enjoys." *Id.*

### Funding of Adverse Judgment

*Kish III* concludes that a judgment against JUA would be paid from the State treasury, essentially because the Guaranty Fund is established within the "General Treasury." This court questions that conclusion for the following reasons:

- The use here of a *special* nonlapsing fund within a state treasury is a circumstance which is considerably more than a bookkeeping nicety; that ledger account appears to isolate the Guaranty Fund, providing no access by any JUA claimant to the balance of the General Fund of New Jersey;[29]

- The Guaranty Fund (albeit within the General Treasury) was established as the singular source of financing the liquidation of JUA and appears to be accessible *only* through the plans of operation of (first) JUA and (now) MTF; *see* N.J.S.A. 17:33B–5(e) and (f); there is thus no reason to believe that a judgment creditor of JUA or MTF would have *direct* access to the Guaranty Fund;

- As insolvency-liquidation funding, the Guaranty Fund was first established *after-the-fact* of the insolvency of JUA. JUA was at origin "an independent entity for which the [S]tate initially

had no financial responsibility," *id.* at 128; this is a strong indicator that when the Guaranty Fund was created, State exposure was a measured indemnity consisting of restricted funds;[30] after the 1994 Act, MTF's participation was likewise premised upon that facility's acknowledged preexisting insolvency; *see* N.J.S.A. 17:33B–5(d) and (f); and

- The Guaranty Fund includes *private*-source PLIGA loans, subject to call (with the balance of the fund) through operational plans consistent with insurance entity/marketplace needs (MTF and/or JUA claim requirements, for example); unlike the unrestricted portion of the General Fund, there is no indication in the formation or history of this mixed source insurance guaranty fund that *other* State obligations could be satisfied from it, particularly given PLIGA's established purpose and required contribution. *See* N.J.S.A. 17:33B–5(c) and 17:30A8(a)(10).

Additionally, this court agrees with *Kish III's* conclusion that JUA could satisfy a judgment against it from its own funds (*id.* at 128 citing the Commissioner's certification that as of March 1, 1996 "there were sufficient monies in the [Guaranty] Fund to satisfy the JUA's current and anticipated obligations").

---

**29.** N.J.S.A.17:33B–5(d) provides that the Guaranty Fund "including interest earnings thereon, are *specifically dedicated* and shall be utilized *exclusively* for the costs and purposes of satisfying the financial obligations" of, first, JUA, and then, MTF. (Emphasis added.) *Compare and contrast Blake v. Kline*, 612 F.2d 718, 723 (3d Cir.1979) (where teachers' retirement funds were derived from multiple sources, including state appropriations, and were "set apart in the state treasury from general state funds," but where it was clear

that "[t]he payment of benefits is specifically made the obligation of the State").

**30.** *See Fitchik v. N.J. Transit Rail Opers., Inc.*, 873 F.2d 655, 661 (3d Cir.1989) (State appropriation "to meet any shortfall caused by judgments" are "voluntary payments by a state [and] do not trigger sovereign immunity") (quoted with approval in *Bolden v. SEPTA*, 953 F.2d 807, 819 (3d Cir.1991)). *See also Kovats v. Rutgers, the State Univ.*, 822 F.2d 1303, 1309 (3d Cir.1987).

The third funding conclusion of *Kish III*, *i.e.*, the State's immunity from JUA debt, is questioned. This court believes, contrary to *Kish III*, that (as set forth above) the special characteristics of the Guaranty Fund and its development in the liquidation phase of JUA could well immunize New Jersey's General Treasury from payment of JUA debts in *Christy* terms. The Guaranty Fund is "in" but not "of" the General Treasury; it is not readily and directly accessible to creditors of JUA; and it is a multi-source fund including private loans. However, conclusions about JUA need not be pursued further here; MTF is the entity at issue.

*Kish III* viewed MTF differently from JUA. *Kish III* holds (and this court concurs) that the State has not established that a judgment against MTF would be paid by New Jersey.[31] This court's differing view of the Guaranty Fund, of course, enhances that conclusion *sub judice*. In fact, the Guaranty Fund as it became available to MTF (and after the 1994 legislation), was even more heavily reliant on PLIGA loan installments than was the

fund in its earlier years. And, as *Kish III* documents,[32] other non-State treasury funding was made available to MTF.

*Kish III* (*id.* at 128), demonstrates that MTF could well satisfy a judgment against itself, and in this regard this court is influenced by the Kish III record and again concurs. As to debt immunity, while *Kish III* considers the State to have partially immunized itself from MTF debts,[33] this court is more inclined to see that immunity as potentially total. As established, "[t]he statutory structure of the MTF shows that [its] members ... are responsible for the losses of the facility." *Id.*, *citing* N.J.S.A. 17:33B–11. Again, the availability of non-State funding sources for MTF debt was referenced to support the immunity. *Id.* *Kish III's* view of the Guaranty Fund is the basis for its ambivalence as to immunity being partial; as indicated, this court is satisfied with the immunity aspects of the Guaranty Fund. Moreover, this court emphasizes the overarching point: throughout the entire policy-issuing life of both JUA and MTF, the *form of insurance*

---

**31.** "In the instant case, three out of four sources available to pay a judgment against the MTF are not state-derived." 221 B.R. at 129. *See also id.* at 126–27. Reference is made to the EDA bond funds, as well as the $439 million MTF member assessment and the $320 million PLIGA loan, the last item viewed by this court as clearly passing through the Guaranty Fund.

**32.** As previously noted, it appears that a claim against the MTF could come from the [Guaranty] Fund, which is within the state treasury, or from one of the other three sources of MTF funding which are not within the state treasury. The Third Circuit has stated that "relief should not be viewed as coming from the state where an entity has the ability to pay the judgment from private funds not subject to state control." *Kovats v. Rutgers, The State University*, 822 F.2d 1303, 1308 (3d Cir.1987). The court finds that the defendants have not proven that a judgment against the MTF

would be paid from the state treasury rather than from other sources. [221 B.R. at 127.]

**33.** Settlement of a lawsuit between the Commissioner and MTF members capped the members' liability at $439 million. Senate Statement 1250. As with the JUA, however, the state has permitted the [Guaranty] Fund to be used to pay a portion of the liabilities and expenses of the MTF. *Id.* at 17:33B–5(d). As noted, the GDPA also provides for non-state funding sources for payment of the MTF's obligations. Further, the state has specifically disclaimed liability for the MTF bonds issued to cover MTF liabilities and expenses. N.J. Stat. Ann. 34:1B–21.9 ("[MTF] bonds ... shall not be a debt or liability of the State or any agency or instrumentality thereof"). Therefore, it appears that New Jersey has provided one state resource for the payment of the MTF debt but has also taken steps to immunize itself from responsibility for the MTF's obligations. [221 B.R. at 128.]

48

*contract* each issued (reviewed in depth by this court as part of the record *sub judice)* makes no reference to the State as an obligor or that the issuer is an arm or instrumentality of the State. In the tens of thousands of contractual relations thus established, no insured or claimant was ever assured by contract that the State underwrote these policies. New Jersey simply did not serve as the insurer, and thus remains immune from the debts of the insuring entities, MTF and JUA.

This court concludes that, per the *Christy* funding factor, payment of a judgment against MTF would not come from the State.

### Status of State Law

*Kish III* (221 B.R. at 129) examined the status of New Jersey law in accordance with *Christy* as follows:

In evaluating the JUA and MTF's status at state law, the court's purpose is to determine whether New Jersey law treats the agencies as independent entities or as surrogates for the state. *Christy,* 54 F.3d at 1148. The court looks at how the state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own name, and whether it is immune from state taxation. *Id.* at 1144.

It is clear to this court, as it was in *Kish III,* that JUA and MTF were at origin established with the intent that they be generally independent of the State. *Kish III* synopsized as follows:

The JUA is an unincorporated nonprofit association comprised of all insurers licensed to transact automobile insurance in New Jersey. N.J. Stat. Ann. 17:30E–4. It is operated by its own board of

34. Likewise, "surcharge" is not a mere accidental or random term devoid of historical

directors. *Id.* at 17:30E–5. The legislature established the MTF as a separate organization run by the Commissioner, but whose members were private insurance companies. *Id.* at 17:33B–11(a). The private insurance companies were to share in the profits and losses of the MTF. *Id.* Originally, an Advisory Board of six members representing various aspects of the private community also served the MTF. *Id.* at 17:33B–11(b) (repealed June 29, 1994). [221 B.R. at 129.]

This court would also view JUA and MTF in their historical context, as extensions of the NJIUA and various insurer insolvency mechanisms and facilities. The nongovernmental nature of these entities—as intended by the State—thus becomes clearer. JUA, as stressed in *Kish III,* was organized as an "unincorporated nonprofit association" per N.J.S.A. 17:30E–4. If it were intended to be a "governmental unit," it would hardly be necessary to deem it to be "nonprofit." This form of unincorporated association is a time-honored organization for insurers. *See, e.g.,* N.J.S.A. 17:49–1, *et seq.,* "Insurance by Individuals, Partnerships and Unincorporated Associations." *See also* N.J.S.A. 17:29A–30; *McCarter v. Firemen's Ins. Co.,* 74 N.J. Eq. 372, 73 A. 80 (E. & A.1909); Couch §§ 4:14 and 39:46. The dubbing of the "New Jersey Insurance Underwriting Association" as the "JUA" (for the "Joint Underwriting Association") is in keeping not only with industry and historic linguistics,[34] but with tried-and-true industry entity configuration. MTF, on the other hand, is simply referred to as "Market Transition Facility," an opaque term for present purposes. It was, nonetheless, created to serve, at least in meaningful

significance.

part, as "successor to JUA." N.J.S.A. 34:1B–21.2a.

■ Both JUA and MTF were membership associations comprised of "[e]very insurer authorized to transact automobile insurance in this State." N.J.S.A. 17:33B–11(a) (as to MTF). *See* N.J.S.A. 17:30E–4 (as to JUA). That fundamental never changed. However, governance changed for MTF.[35] It began with an Advisory Board appointed by the Commissioner of Insurance (including one public member), but the 1994 legislation (post-MTF insolvency and litigation between the members and the Commissioner) eliminated the Board. N.J.S.A. 17:33B11(b)(former). The Commissioner, in effect, took over as MTF's liquidator. *See, e.g.,* N.J.S.A. 17:33B–11(c), (f), and (g)(1994). JUA is now subject to a statutory trusteeship, the Legislature having declared that "if it were a *licensed insurer*[36] ... [it] ... would likely be declared financially impaired or insolvent pursuant to the provisions of ... [N.J.S.A.]17:30C–1...." N.J.S.A. 17:33B–3(a) and (b) (emphasis added). Thus, in terms of membership and governance, there is yet another mixed legislative message: private licensed automobile insurers are the association members as to both JUA and MTF, but mandatory membership and State control of governance is evident. This court views the membership characteristic as being more meaningful in evaluating the "governmental unit" question, particularly in the area of such a highly regulated industry. To one extent or another, the Commissioner regulates insurers within his/her jurisdiction, albeit not to the degree established for JUA–MTF.[37] Moreover, current MTF "governance" is a function of the Commissioner's role as the liquidator of an insurer.[38]

*Kish III* examined JUA–MTF in tandem, in terms of the ability of the entities to sue and be sued, and other characteristics of status. This court generally agrees with this aspect of *Kish III*. It is clear, as *Kish III* indicates, that each can "sue and be sued in its own name." Authority to contract was found to be evident for both. N.J.S.A. 17:30E–7(a)(JUA) and 17:33B–11(c)(MTF). Both were determined to be "able to transact automobile insurance" in New Jersey. And *Kish III* indicates that JUA and MTF both seem to have been subject to State taxation to one or another degree. *Id.* at 129.

This court offers certain amplification as to State taxation of JUA–MTF. MTF is plainly not exempt from State taxation; quite to the contrary. "The facility shall be subject to the provisions of ...

---

35. JUA's board evolved and was ultimately reconstituted in 1988 (reduced in size from seventeen to nine, with continuing powers of appointment spread among the Governor, the Speaker of the General Assembly and the President of the Senate). N.J.S.A. 17:30E–5(a).

36. Note that here the Legislature distinguishes JUA from other insurers on the basis of *licensure*, not governmental status. As to the MTF, the Legislature declared the applicability of the insolvent insurer procedures of N.J.S.A. 17:30C–1 *et seq.*, but found that initiating these procedures was "not in the best interests of the facility's policyholders and other claimants...." N.J.S.A. 34:1B–21.2(c).

37. As to NJIUA governance, *e.g., see* N.J.S.A. 17:37A–5.

38. *See* N.J.S.A. 34:1B–21.2(c). It is this court's view that the Commissioner's control function as the liquidator of an insurer, a role including "public" responsibilities, perhaps, but not necessarily "governmental" in nature, does not convert the *entity* being liquidated into a "governmental unit." *See Integrity Ins.,* 165 N.J. at 90, 754 A.2d 1177 (premising the public aspect of the Commissioner's role on the *effect on the public* of the insurance business, including insolvent carrier liquidation).

[N.J.S.A.] 54:18A–1, *et* seq . . . ." N.J.S.A. 17:33B–11(e). The cited statutory section is "Taxation of Corporations; Individuals, Partnerships and Unincorporated Associations Transacting Insurance Business." Such taxation applies to each "insurance company . . . transacting business in this State . . . ." N.J.S.A. 54:18A–1(a). *See* "insurance company" defined in N.J.S.A. 54:18A–9(a). This is an indicator that MTF is a nongovernmental entity and was organized to transact "business" in New Jersey, not offer government services. JUA likewise appears to have been subject to that tax. N.J.S.A. 17:30E–22.

Ultimately, in its review of State law for *Christy* test purposes, *Kish III* cites (at 129) the State's 1992 position that JUA is not a New Jersey agency. *See In re Comm'r of Ins.'s Certification of Amendment to New Jersey Auto. Full Ins. Underwriting Ass'n Plan of Operation,* 254 N.J.Super. 620, 628, 604 A.2d 172 (App. Div.1992). This court agrees that the State's position in litigation is meaningful. However, the *Kish III* cited case (and others) deciding the applicability of New Jersey's Administrative Procedure Act, N.J.S.A. 52:14B–1 *et seq.,* are not necessarily applicable to the "governmental unit" inquiry. These cases introduce the difficulty in dealing with JUA–MTF in terms of public disclosure and hearing requirements where the Commissioner of Insurance, a "State agency" in his/her own right per the Act (N.J.S.A.52:14B2(a)), is in control. And the Commissioner serves, as the Supreme Court of New Jersey sees it, in a hybrid role as a liquidator of an insurer, part public and part private. *See Integrity Insurance,* 165 N.J. at 91, 754 A.2d 1177. With the Commissioner in place, his/her actions (such as approving a public affecting plan of operation for an insolvent insuring entity), could well require administrative due process either under the Act *or otherwise. See George Harms Const. Co.*

*v. New Jersey Tpk. Auth.,* 137 N.J. 8, 19, 644 A.2d 76 (1994); *In re Reorganization of Medical Inter.–Ins. Exch. of New Jersey,* 328 N.J.Super. 344, 366, 746 A.2d 25 (App.Div.2000), *certif. denied* 165 N.J. 530, 760 A.2d 784. This would be the case, it is submitted, even if the liquidating insurer were a clearly *private* enterprise. And, *see* N.J.S.A. 17:33B–11(c)(9) and (f) (specifically exempting the Commissioner's amendment of MTF's plan of operation from the purview of the Administrative Procedure Act).

In any event, *Kent* (finding MTF to be a governmental unit) chose to cite two *other* Appellate Division cases for a position contrary to that of *Kish III's* Appellate Division precedent. In *In re Order of Commissioner of Insurance Deferring Certain Claim Payments by NJ JUA,* 256 N.J.Super. 553, 607 A.2d 992 (App.Div.1992), the procedure for adopting the JUA Plan of Operation was at issue. The 1990 Reform Act provided for the Plan (N.J.S.A.17:33B–3(b)(1)(2)); approval of the Commissioner of Insurance was required. *The Commissioner contended that JUA was not a State agency.* 256 N.J.Super. at 560, 607 A.2d 992. The Appellate Division noted:

> In support of this position, the Commissioner cites *In re Comm'r of Ins.'s Certification of Amendment to the New Jersey Auto. Full Ins. Underwriting Ass'n Plan of Operation,* 254 N.J.Super. 620, 604 A.2d 172 (App.Div.1992) and an unreported decision of the Appellate Division. Although *these cases provide that the JUA is not a state agency in certain contexts,* the rationale supporting that conclusion is inapplicable here. In this case, compliance with the Administrative Procedure Act was essential to protect the policyholders' contract rights and the status of the current tort law.

* * *

The JUA and the Commissioner contend, however, that the necessity of governmental supervision is obviated by the JUA's status as an independent entity. We disagree. The JUA has been protected from insolvency by legislative guidance. The rehabilitation procedure drawn for the JUA has been specifically promulgated by the Legislature and supervised by the Commissioner of Insurance. Being the object of legislative salvation, the JUA has clearly benefited by state action. *Thus, it must abide by state procedure when implementing a course of action which will affect thousands of taxpayers.*

*Moreover, if the JUA were to be considered an independent entity in receivership, it would be subject to the jurisdiction of the Chancery Division, General Equity.* ... In that situation, the Chancery Division, General Equity, would have the inherent and statutory power to appoint a receiver who would acquire title to the corporation's assets and be empowered to dissolve it. *See* N.J.S.A. 14A:14–4. *The insolvent corporation's creditors would be given the opportunity to have input in the proceedings and to examine the corporation's records to determine if and when payments would be made.* This entire proceeding would be supervised by the Chancery Division, General Equity.... *The rights of policyholders with an insolvent private insurer cannot exceed those of JUA claimants, who are entitled to equal protection and assurance of constitutional due process.*

*Id.* at 560–61, 607 A.2d 992 (certain citations omitted and emphasis supplied). Thus, while the appellate panel did go on to attribute a State instrumentality label to JUA for purposes of the Administrative Procedure Act, it recognized the public interest aspect of the JUA liquidation as being equally accommodated by garden variety receivership processes. And, as to the applicability of the Act generally, *see Lipman v. Rutgers The State University of New Jersey,* 329 N.J.Super. 433, 441–42, 748 A.2d 142 (App.Div.2000) ("Rutgers ... was not [by organic statute] administratively located within an Executive Branch department. The University [therefore] is not a State agency under the Administrative Procedure Act."). Neither JUA nor MTF was ever "administratively located within an Executive Branch department."

It should also be noted that in its next reform after the *In re the Order* decision (256 N.J.Super. 553, 607 A.2d 992), the Legislature chose to exempt the procedure to be utilized by the Commissioner in amending *MTF's* Plan of Operation from the ambit of the Administrative Procedure Act. N.J.S.A. 33B–11(c)(9) and (f)(L.1994). This appears to give some weight to the Commissioner's earlier stated position that the quickly receding JUA was not intended to be a "State Agency" even for procedural purposes. Furthermore, without considering the 1994 reform, the Appellate Division's characterization of JUA and MTF was at best ambivalent in the second-cited *Kent* case. *Strube v. Travelers Indem. Co.,* 277 N.J.Super. 236, 239–40, 649 A.2d 624 (App.Div.1994), *aff'd* 142 N.J. 570, 667 A.2d 188 (1995), refers to JUA and MTF, alternatively, as "agencies" (a term selected for reference in *Kent*), and also as "entities" and "organizations," all within the same paragraph. *Consider also In re Commissioner of Insurance,* 132 N.J. 209, 224, 624 A.2d 565 (1993), where after analysis of MTF's role, the Supreme Court concluded that "[t]he MTF is obviously, then, a most unusual *public entity.*" (Emphasis added.) No mention was made of "State Agency" or a like term.

The State *sub judice* cites the "State Agency" status of the Individual Health Coverage Program ("IHCP"), N.J.S.A. 17B:27A–1 *et seq.*, as supportive of its position. This argument, by analogy to a health insurance program as affected by State procedural requirements, is again somewhat off the mark as being grounded in the Administrative Procedure Act. Moreover, JUA and MTF are readily distinguishable from IHCP. IHCP, not an operating insurer or insolvency facilitator, is predominantly a regulatory program. Its "Board" is "to *oversee and regulate* a program designed to make individual health care coverage available and affordable for those not in a group." *In Matter of New Jersey Individual Health Coverage Program's Readoption of N.J.A.C. 11:20–1 et seq.*, 353 N.J.Super. 494, 498, 803 A.2d 639 (App.Div.2002) (applying the Administrative Procedure Act to IHCP) (emphasis added). The Board is expressly authorized to promulgate administrative regulations. *Id.* at 515–16, 803 A.2d 639. *See* N.J.S.A. 17B:27A–16.1(a) (h). It is empowered to "establish . . . policy and contract forms and benefit levels. . . ." N.J.S.A. 17B:27A–7. To some extent, the IHCP Board has adjudicatory powers. *In Matter of NJIHCP*, 353 N.J.Super. at 518, 803 A.2d 639. And, even as a purported "market-opener," IHCP departs from the entity aspects of JUAMTF; it differs fundamentally as well because both JUA and MTF functioned as *operational* insurers, and MTF also served the marketplace as a liquidating *facilitator*.

*Compare and contrast* IHCP (as well as JUA–MTF) with the Compensation Rating and Inspection Bureau ("CRIB"), operating through insurer-members in the workers' compensation area. CRIB, a statutory rate-setting entity, was viewed as *"more an arm of the insurance industry or a cooperative agency than a governmental agency."* *Aetna Ins. Co. v. Trans Am. Trucking Serv., Inc.*, 261 N.J.Super. 316, 320 n. 4, 618 A.2d 906 (App.Div.1993) (emphasis added).[39]

In the final analysis, neither IHCP nor CRIB is closely analogous to JUA and MTF. Rather, the JUA–MTF precursors remain most relevant in evaluating New Jersey law through analogous entities or programs. As set forth earlier, FAIR plan's NJIUA as a market-opening entity, and PLIGA Special Joint Underwriting Association as insolvency workout facilitators, are found to be significant in supporting the conclusion that JUA and MTF were simply not intended to be "governmental."[40]

As was decided in *Kish III*, this court concludes that both JUA and MTF were,

---

**39.** The full footnote, 261 N.J.Super. at 320 n. 4, 618 A.2d 906, is as follows:

This Bureau was established in 1917 as a "membership organization composed of all the companies writing compensation insurance in the State and presided over by a Special Deputy Commissioner of Banking and Insurance." *Magna Mfg. Co. v. Aetna Casualty & Sur. Co.*, 129 N.J.Eq. 142, 144, 18 A.2d 565 (Ch.1941). *See* N.J.S.A. 34:15–89; *Harper v. New Jersey Mfrs. Casualty Ins. Co.*, 1 N.J. 93, 97, 62 A.2d 135 (1948). Although under the supervision of the Commissioner of Insurance and presided over by a Special Deputy Commissioner appointed by the Commissioner as *ex officio* chairman of the Bureau, N.J.S.A. 34:15–90, *it*

*appears more an arm of the insurance industry or a cooperative agency than a governmental agency.* The member insurance companies choose the officers, members of committees and employees of the Bureau, subject to the Commissioner's approval. *Id.* [Emphasis added.]

**40.** Yet another area for comparison—no more apposite than the Administrative Procedure Act though similarly dependent on entity status as a threshold matter—is the New Jersey Tort Claims Act. N.J.S.A. 59:1–1 *et seq.* *Comment* to the "Definitions" section of N.J.S.A. 59:1–3 is as follows:

The definition of "Public Entity" provided in this section is intended to be all inclusive

when organized, intended to be essentially independent of the State. This is the case, even though both have been heavily regulated, and as to MTF, the enterprise served as an insolvency mechanism involving the private market and the principal State regulator. MTF's ultimate role as a liquidation facilitator akin to other temporary amalgams of private insurers, is readily discernible. *See* N.J.S.A. 17:30A–1 et seq. (PLIGA); N.J.S.A. 17:30B–1 *et seq.* (Special Joint Underwriting Association). What is not discernible is any clear intent to "convert" JUA and MTF to government instrumentalities as they spiraled down into financial distress. The State in its wisdom organized "burial" funding for the entities, but did not demonstrate a knowing absorption of multibillion dollar debt-ridden insurers into its governmental organization chart. New Jersey law does not evidence that JUA or MTF were intended to be governmental units.

### Autonomy

*Kish III* concludes the autonomy factor as follows:

> The attributes of the MTF and JUA indicate that the degree of control exercised by the state over those entities is

and to apply uniformly throughout the State of New Jersey to all entities *exercising governmental functions.* The intent of this provision is to provide a basis upon which an established body of law may be uniformly applied. For the purposes of establishing liability in the State of New Jersey this definition is specifically intended to include such entities as the New Jersey Highway Authority and Turnpike Authority and Rutgers the State University. [Emphasis added.]

Contrary to the Act, *Christy* would, in greatest probability, define the New Jersey Turnpike Authority (as it did its Pennsylvania counterpart) as not being an arm of the State for sovereign immunity purposes, while *Kovats* has decided that *Rutgers* was not the State's *alter ego* in Eleventh Amendment terms. As to the "governmental functions" standard,

similar to the degree of state control of the turnpike commission in *Christy*. In *Christy*, the turnpike commission membership was controlled by the executive and legislative branches of the government. The *Christy* court noted, "[s]tate authority over the Commission members lends obvious support to a finding of sovereignty." 54 F.3d at 1149. Similarly, the statutorily-mandated creation and demise of the JUA and MTF, their largely governmental directorates, and the extent of control that the state exercises over them cause this factor to weigh in favor of a finding of [sovereign] immunity.

221 B.R. at 130. *In re Commissioner of Insurance's*, 132 N.J. at 224, 624 A.2d 565 was cited by *Kish III* (and earlier by *Kent*, 190 B.R. at 205) for the characterization of the Commissioner's role with MTF as "in effect, the chief executive officer of the State's largest automobile-insurance company." In fact, in this court's view, that statement highlights the essence of the *non*governmental function and character of MTF,[41] even as it would be read to restrict "autonomy." Thus, while it is true that in *Christy* terms JUA and MTF are substantially State controlled, that control

*compare and contrast Mesgleski v. Oraboni*, 330 N.J.Super. 10, 748 A.2d 1130 (App.Div. 2000) (finding the Society for the Prevention of Cruelty to Animals, exercising statutory regulatory authority as its "governmental functions," to be a "Public Entity" for Act purposes), with *Snyder v. American Ass'n of Blood Banks*, 144 N.J. 269, 304–05, 676 A.2d 1036 (1996) (finding the American Association of Blood Banks was not organized for a "specific governmental purpose," and thus was not subject to the Act).

41. The full and edifying statement of the Supreme Court of New Jersey in this case (132 N.J. at 224, 624 A.2d 565) is as follows:

At its peak, MTF was expected to insure approximately 1,300,000 drivers. And those were not all bad drivers. As of December 1991, "over 60% of MTF insureds

is manifested in regulation of the private insurance industry and the marketplace. There remains the distinction—even where the regulator and the regulated industry are closely knit—between the State Commissioner in his official capacity, and MTF as an industry-membership entity which had become the State's "largest automobile insurance company."

### *Conclusion—Christy Factors*

■ MTF is not an arm of the State, nor a "governmental unit," when admeasured against the *Christy* factors. *Kish III* reached this conclusion, and this court agrees. In fact, this court views the funding factor as even more weighted toward this conclusion than did *Kish III*, sees State law supporting this conclusion, as did *Kish III*, and is more inclined to see the autonomy issues in the context of the Commissioner's role as a regulator of the private insurance marketplace than did the *Kish III* court. And, though it is not necessary to decide the status of JUA, this court is inclined to disagree with *Kish III*, particularly as to the funding factor, and conclude that JUA is likewise neither an arm of the State nor a governmental unit.

### *UTILIZING THE LIMITED LEGISLATIVE HISTORY OF 11 U.S.C. § 101(27)*

The District Court in *Lugo* concluded as follows:

It is clear that Section 523(a)(7) does not apply to moneys payable to the JUA,

since it is not a governmental unit. The DMV, which is a governmental unit, retains only money necessary to compensate it for the actual costs of administering the collection, or the government's "actual pecuniary loss." The surcharge is therefore not within the definition of a Section 523(a)(7) exception.

94 B.R. at 341. This conclusion is consistent with the *Lugo* court's introduction of JUA as "an unincorporated, nonprofit association of insurers licensed to provide automobile insurance in New Jersey," *id.* at 337 (footnote omitted), amplified later in the opinion by the characterization of JUA as "a *private* association of insurance companies." *Id.* at 341 (emphasis in original).[42]

In *Kent*, the Bankruptcy Judge initially reexamined *Lugo*, offering that the § 523(a)(7) determination of the District Court "was included as dictum," and that "significant statutory changes have been implemented since ... *Lugo* ...," a reference to the 1990 and 1994 acts. 190 B.R. at 203. The statutory definition of "governmental unit," use of the term throughout the Code, and certain legislative history of the 11 U.S.C. § 101(27) definition, were then reviewed. *Id.* at 203–04. The cited history includes the following:

[Section 101(27)] defines "governmental unit" in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territo-

---

[had] clean driving records." The Legislature directed that the Commissioner reassemble the fragmented pieces of the industry by finding places in the system for the automobile-insurance sales force that had grown up under the JUA and made the State's automobile insurance companies "members" of the Commissioner's company, the MTF. The MTF is obviously, then, a most unusual public entity. The Legislature gave the Commissioner full authority to include in the plan of operation provi-

sions as "are deemed necessary for the operation" of the MTF. N.J.S.A. 17:33B–11.-c.(9). This case tests the measure of that authority.

**42.** There does not appear to be any State or JUA argument to the contrary in *Lugo*, a State position quite consistent with that taken by the Commissioner in 1992, when the State argued that "JUA is not a state agency." *In re the Order of the Comm'r of Ins. Deferring Certain Claim Payments by the NJ JUA*, 256 N.J.Super. at 560, 607 A.2d 992.

ry, municipality or foreign state, and a department, agency, or instrumentality of any of those entities. "Department, agency, or instrumentality" does not include entities that owe their existence to State action such as the granting of a charter or a license but that have no other connection with a State or local government or the Federal Government. *The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.* H.R.REP. No. 595, 95th Cong., 1st Sess. 311 (1977); *See* S.REP. No. 989, 95th Cong., 2d Sess. 24 (1978), U.S.C.C.A.N.1978, pp. 5787, 5810, 6268. (Emphasis added *sub judice.*)

It is this court's position that the District Court in *Lugo* well understood the nature of JUA, as it was originally constituted with private membership, and particularly as to *function;* JUA, a "market-opening" facility created by a statutory scheme within a highly regulated area, never engaged in "actually carrying out some governmental function." Rather, it was an insurance company, as was its transitory successor, MTF, though MTF was also functioning as an insolvency facilitator. Again, consider *Kent's* quote of *In re Commissioner of Insurance's,* 132 N.J. at 224, 624 A.2d 565, characterizing the Commissioner's role with MTF as "in effect, the chief executive officer of the *State's largest automobile-insurance company.*" (Emphasis added.) And, though the Commissioner's service as a liquidator has been found to be a hybrid of both private and public characteristics, *In re Liquidation of Integrity Insurance Co.,* 165 N.J. at 90–91, 754 A.2d 1177, the *entity function* of MTF

is both as a nonprecedent setting market-opening joint underwriting association and as a liquidation medium. Neither function is governmental in nature. *Compare, e.g.,* PLIGA, a *private* entity organized by statute to facilitate payment of covered claims in the event of insurer insolvency, N.J.S.A.17:30A–1 *et seq.,* and the "Special Joint Underwriting Association" mechanism (with characteristics closely reflected in MTF) of N.J.S.A. 17:30B–1 *et seq.*

■ Regarding MTF as a liquidation medium, the limited legislative history of the "governmental unit" definition (§ 101(27)), includes more insight than the *Kent*-quoted material. Indeed, the text immediately following the quoted history offers by way of illustration that "[t]he United States trustee, even though an employee of the United States, *is not a governmental unit when he is representing an estate in a bankruptcy case.*" H.R.REP. No. 95, etc., supra. Compare this illustration with the private-public hybrid role of the New Jersey Commissioner of Insurance when the Commissioner serves as liquidator of an insurer. In answering the question of federal law as to whether MTF is a governmental unit,[43] therefore, the trustee illustration is helpful. Arguably, the Commissioner's role as liquidator for federal law purposes could be viewed as "private," *Integrity* notwithstanding. However, even if the hybrid role of the Commissioner is accepted per *Integrity,* nothing in either federal or State law justifies a conclusion that the liquidator's status somehow casts the liquidating entity as a "governmental unit."[44]

The Code's legislative history standard for governmental unit ("actually carrying out some governmental function," similar

---

**43.** State law, including case law defining status of an entity, is a factor to be considered in the "alter ego" determination, but the question remains one of federal law. *Urbano v. Bd. of Managers,* 415 F.2d 247, 250–51 (3d

Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970). *See also Blake v. Kline,* 612 F.2d 718, 722 (3d Cir.1979).

**44.** *Kent,* selecting a series of characteristics for determining governmental unit status, 190

to that of the Comment qualifier for the New Jersey Tort Claim Act, "exercising governmental functions") raises an issue. The Third Circuit has eliminated the functional test from its sovereign immunity standard and, by implication, might well direct this court to avoid defining, as a federal court and according to this court's views, the appropriate ambit of state governmental functions. *See Fitchik,* 873 F.2d at 659 n. 2 (reducing the *Urbano* factors based upon *Garcia v. San Antonio Metro Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)). Nevertheless, this court is comfortable in interpreting *New Jersey* law, and concluding that JUA and MTF are not, by intent of the New Jersey Legislature or established New Jersey case law, "governmental" in function.

### STATE'S CONTENTION: EDA IS THE BENEFICIARY OF THE DMV SURCHARGES

■ In *Kish IV,* the State and the debtor "stipulated that the surcharge is not collected for the benefit of the JUA or the MTF." 238 B.R. at 286. The State generalized its argument, disregarding the recipient question in favor of the contention "that in collecting the surcharges for distribution to third parties the state is performing a legitimate governmental function which will inure to the general benefit of the state's citizens." *Id.* That position ran afoul of *In re Towers,* 162 F.3d 952 (7th Cir.1998).[45]

*Sub judice,* the State has (again) altered its position and identifies EDA as the § 527(a)(7) beneficiary. Yet, EDA here is simply a facilitator, issuing nongeneral obligation bonds backed by the stream of DMV surcharge revenue. Bond proceeds are used to satisfy MTF debt. In essence, the surcharge revenue stream was present-valued through the financial marketplace mechanism of the bond issue. The fundamental linkage between the DMV surcharges (Mrs. Pulley's debt included) and MTF was not altered by the 1994 interposition of EDA and the resulting

B.R. at 205, gives no apparent weight to: the *membership* of the MTF (*i.e.,* private insurers); the *historical origins* of joint underwriting associations (as both market openers and insurer liquidating facilities); the *function as an insurer* served by MTF; the lengths to which Commissioners and the New Jersey Legislature went to *shield general funds* from exposure to insurance claims against JUA and MTF issued-policies *and* from their massive accumulated debt; the *historical origins in the private market* of the current DMV surcharges; and, most generally, to the context of the determination, *i.e.,* in the highly regulated area of State control over insurers implicating uniform laws and practice in the insurer liquidation process. *Kent* did not assess the *Christy* factors. Rather, *Kent* considered the absence of "private liability on the part of the individual insurers who are members of the entities," and "immunity from liability for election of the level of coverage by the insured as long as the minimum amount required by law is provided pursuant to N.J.S.A. 17:28–1.9...." 190 B.R. at 205. In fact, if JUA–MTF *losses* were to be covered by the private insurers (whether in whole or in significant part), the "absence of private liability" is relatively insignificant. Similarly, the very limited immunity provision dealing only with State-prescribed levels of coverage and insured's election thereof, is quite benign. This court would thus respectfully disagree with *Kent.*

45. Debtor was ordered to pay civil restitution to his victims in a fraudulent home rescue scheme following an action brought by the State under its fraud and deceptive practices act. The Seventh Circuit determined that restitution payable *to* a governmental unit (as the restitution would be collected by Illinois) but not *for the benefit of* a governmental unit (as the restitution would be distributed to debtor's victims) was not excepted from discharge under § 523(a)(7). Although the restitution order did not explicitly require distribution to the debtor's victims, it was understood that the State would do so.

MTF bond issue. As late as a 2001 EDA MTF bond issue (to defease and advance refund the 1994 EDA MTF maturing bonds), that linkage was reiterated. Consider the following Official Statement from that issue's November 15, 2001 Prospectus (the "Prospectus") (at pp. 1–2, Bates Nos. 471–72) (emphasis added):

*Proceeds of the Series 1994 Bonds, together with other monies available for such purpose at said time, were applied to pay the then current and anticipated liabilities and expenses of* [MTF]. [MTF] issued private passenger automobile insurance policies for drivers who could not be insured by private insurance companies on a voluntary basis. [MTF] was created ... to assure the orderly phasing out of [JUA], which had been providing insurance for drivers whom the voluntary market was unwilling to insure, and its replacement with an assigned-risk plan whereby each insurer is responsible to insure its share of such high-risk drivers....

The Market Transition Facility was authorized to issue and renew private passenger automobile insurance policies between October 1, 1990 (when the JUA ceased to offer insurance) and September 20, 1992. The MTF ceased to issue or renew private passenger automobile insurance policies on September 30, 1992 and the last policies issued or renewed by the MTF expired on September 30, 1993. The Market Transition Facility operates pursuant to a plan adopted by the Commissioner....

*The 1994 Act provides that the bonds, notes or other obligations issued to finance or refinance the liability of the MTF will be repaid solely from amounts transferred to the Authority from the DMV Surcharge Fund established by the 1994 Act and held by the Treasurer of the State.* ... Such amounts constitute surcharges collected

after March 1, 1996 assessed on drivers who commit certain violations (the "Surcharges"). The violations for which Surcharges are imposed are: (i) driving while intoxicated, (ii) receiving 6 or more motor vehicle points during the three-year period preceding the imposition of the surcharge, (iii) driving without a license, (iv) driving without insurance and (v) driving with a suspended license. Such Surcharges have been imposed since 1984. There is no prohibition upon the State's amending or repealing such Surcharges.... The 1994 Act provides that commencing September 1, 1996 (or such earlier time as the Commissioner ... certifies to the State Treasurer that there are sufficient amounts held to pay the current and anticipated financial obligations of the JUA, which occurred on March 1, 1996) all such Surcharges shall be deposited in the DMV Surcharge Fund held by the State Treasurer. Prior to March 1, 1996, the Surcharges were applied to pay the then current and anticipated financial obligations of the JUA.

The Prospectus (p. 7 Bates No. 477) likewise describes EDA's position as a mere facilitator, to wit:

Pursuant to the Act and the Resolution, the *Bonds shall be special, limited obligations of the Authority and shall not be in any way a debt or liability of the State or any political subdivision thereof* and shall not create or constitute any indebtedness, liability or obligation of the State or of any political subdivision thereof. All Bonds, unless funded or refunded by bonds, notes or other obligations of the Authority, shall be *payable solely from and secured solely by the Pledged Property. The Authority has no taxing power.* [Emphasis added.]

Consider in this regard the full import of N.J.S.A. 34:1B–21.9, as well as the Committee Report introducing the 1994 Act ("[T]he bonds issued pursuant to this bill are not a debt or liability of the State *or any agency or instrumentality thereof*"), reproduced after N.J.S.A. 34:1B–21.1 (emphasis added).

EDA, authorized "to assist in financing" MTF (Prospectus at p. 21 Bates No. 491), is not a beneficiary of the DMV surcharges levied on Mrs. Pulley. MTF remains the beneficiary and, as can be seen from the Prospectus, is still operating pursuant to plan to phase out claims arising from policies issued a decade or more ago.

### STATE'S CONTENTION: DMV SURCHARGES ARE STATE FUNDS SUBJECT TO ANNUAL APPROPRIATION, A DISCRETIONARY STEP IN SERVICING MTF BOND DEBT

■ In effect, the State argues that the Legislature holds the key to the DMV surcharge flow each year because the monies do not become available for bond debt service without an annual appropriation. Subsumed in this argument is that the State is both the recipient and the beneficiary of the surcharge money, and that honoring the debt service commitment is simply discretionary. The State thus contends that in the § 523(a)(7) analysis, its control of the annual surcharge flow renders the State the beneficiary of the surcharge monies.

The practical reality is that the Legislature's exercise of its purported discretion (*i.e.* the power to refuse to appropriate the surcharge funds to bond debt service), would damn New Jersey bond issues in the marketplace, causing calamity. The annual appropriation is a foregone conclusion. Recent high-profile New Jersey Supreme Court case law readily accepts this premise. *Lonegan v. State*, 176 N.J. 2, 19–20, 819 A.2d 395 (2003) (*"Lonegan II"*); *Lonegan v. State*, 174 N.J. 435, 466, 809 A.2d 91 (2002) (Stein, J., concurring in part, dissenting in part) (*"Lonegan I"*). Indeed, the *Lonegan* cases make clear that the annual appropriation "string" held back by the Legislature is, *today,* more a matter of skirting the Debt Limitation Clause of the New Jersey Constitution than it is a fiscal control. That appropriation feature tends to distinguish "contract" bonds from "general obligation" bonds. *Lonegan I* and *II* drive home the point: contract bonds will be honored, notwithstanding "paper" reservation of control through the appropriation process; "[w]e ... acknowledge the realities of the marketplace." *Lonegan II*, 176 N.J. at 20, 819 A.2d 395.

■ Moreover, there is a broad and extensive State pledge (and resulting Treasurer's contract) providing the bond marketplace with a certain amount of comfort. *See* N.J.S.A. 34:1B–21.10 (including comprehensive undertakings, save for an annual appropriation commitment). In fact, the annual appropriation requirement, a foregone conclusion and a marketplace reality, does not affect this court's view that MTF is the principal, primary and noncontingent beneficiary of DMV surcharges.

### STATE'S CONTENTION: ANNUAL SURPLUSES IN DMV SURCHARGES FIND THEIR WAY TO A RECENTLY ESTABLISHED FUND FOR ALCOHOL TREATMENT AND TO GENERAL FUNDS, THEREBY MAKING THE STATE A RECIPIENT AND BENEFICIARY OF THOSE FUNDS

■ If a portion of DMV surcharges is not needed in any particular year to service the MTF bonds, surplus would be remitted to General Funds. N.J.S.A. 34:1B–21.7(b). To date, even the greatest

such annual surplus has not approached even half of the DMV surcharge funding of that year.[46] Moreover, certain minor amounts *if available as surplus* in the DMV Surcharge Fund (after 2001), are to be remitted to an alcohol program fund. *See* N.J.S.A. 34:1B–21.12 and 26:2B–9.2.[47] However, the majority of DMV surcharges clearly flows to bond debt service, and all of it would be used for that purpose if necessary.

In fact, surplus amounts are quite unpredictable and are thus speculative. The Prospectus warns that DMV surcharge collections (declining annually from 1998 through 2001) cannot be assured. Pp. 16–17, Bates Nos. 486–87. "In addition, debt service requirements may be affected by the issuance of additional [bonds]."[48] *Id.* at 487. And, at some point when the bonds are retired (many years hence given that the 2001 issue includes a 2011 maturity), the PLIGA loans of more than $1 billion will have to be repaid from the flow of DMV surcharges. That cash flow will thus be redirected to another *private* beneficiary in what will inevitably be a long-term payment program. N.J.S.A. 17:29A–

35(b)(2). *See Affiliated FM Ins. Co. v. State,* 338 N.J.Super. 540, 770 A.2d 741 (App.Div.2001).

Given this background, this court cannot consider the State as anything but a contingent beneficiary of the DMV surcharges—a status not sufficient on the face of § 523(a)(7) to justify that exception to discharge.

### CONCLUSION THAT DMV SURCHARGES ARE NOT FOR THE BENEFIT OF THE STATE WOULD NOT IMPAIR STATE'S EXERCISE OF ITS POLICE POWER

This court is mindful of the State's serious responsibility to police the operation of automobiles within its borders. "Courts traditionally have been reluctant to interpret bankruptcy statutes to remit state criminal judgments." *Kelly v. Robinson,* 479 U.S. 36, 44, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). However, discharge of Mrs. Pulley's surcharge debt, or even discharge of the debt of the dangerous drunk driver who is likewise subject to DMV surcharges, will not implicate or compromise the State's ability to enforce its police pow-

---

**46.** The Prospectus (p. 15 Bates No. 485) lists the following DMV surcharge collection by fiscal year:

| 1997 | $130,743,166 |
| 1998 | 150,367,736 |
| 1999 | 142,924,819 |
| 2000 | 132,682,259 |
| 2001 | 125,855,016 |

The State (Brief filed April 1, 2002 at pp. 10–14) details transfers to the General Fund (apparently as of no later than June 30 of each listed calendar year) of $36.2 million (1996), $63.6 million (1997), $58 million (1998), $51.5 million (1999), $46 million (2000) and $40 million (2001). The trend line from 1997 forward in terms of such transfers, and collections from fiscal year 1998 forward, appears to be down.

**47.** These amounts, ranging from $1.5 million in 2002 to $7.5 million in 2006, will obviously reduce the General Fund transfer amounts.

**48.** The concept of surplus on an annual basis is set forth as follows in N.J.S.A. 34:1B–21.7(b):

[A]ny such monies in excess of the amounts required to be used by the authority *pursuant to any bond resolutions authorizing the issuance of Market Transition Facility bonds and notes and the authority's agreement with the State Treasurer* authorized by [N.J.S.A. 34:1B–21.13] shall be at least annually remitted to the General Fund; ... (Emphasis added.)

The substance of *"any bond resolutions"* and EDA's agreement with the Treasurer would thus define "excess"; presumably, this would include such resolutions and agreements covering future or reissued bonds, with terms yet to be defined.

ers. Before the 1982 reform, *i.e.*, before the State stepped in and preempted a certain number of infractions for DMV surcharge purposes, the full array of criminal penalties (fines, points, license suspension, revocation and imprisonment) persisted; it does today. Discharge of DMV surcharges is simply not relevant to the State's enforcement authority to keep roads safe.[49] *See In re Marcucci*, 256 B.R. at 689. *Consider Ohio v. Kovacs*, 469 U.S. 274, 284, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), where after concluding that a state injunction requiring cleanup of hazardous waste was a dischargeable debt, the Supreme Court emphasized:

> [W]e do not suggest that Kovacs' discharge will shield him from prosecution for having violated ... environmental laws or for criminal contempt for not performing his obligations under the injunction prior to bankruptcy.

The Court of Appeals in this circuit has noted that both federal criminal and civil restitution orders (presumably whether federal or state) designed to benefit victims are not deemed "for the benefit of a governmental unit," notwithstanding the contention that such restitution furthers general penal purposes. *In re Rashid*, 210 F.3d 201, 206–08 (3d Cir.2000) (relying on *Towers*, 162 F.3d at 955). And, it is clear that DMV surcharges have been categorized as "civil" penalties. *Clark v. New*

*Jersey Div. of Motor Vehicles*, 211 N.J.Super. 708, 711, 512 A.2d 588 (App.Div.1986); *see also Clark v. Clark*, 324 N.J.Super. 587, 592, 737 A.2d 189 (Ch.Div.1999). *See generally Merin v. Maglaki*, 126 N.J. 430, 599 A.2d 1256 (1992); *Auge v. New Jersey Dep't of Corr.*, 327 N.J.Super. 256, 743 A.2d 315 (App.Div.2000). Therefore, discharge of this debt should not offend traditional notions of federalism.

### CONCLUSION THAT DMV SURCHARGES ARE NOT FOR THE BENEFIT OF THE STATE WOULD FURTHER FUNDAMENTAL BANKRUPTCY POLICY

 Proponents of an exception to discharge have the burden of proving their case (by a preponderance of evidence). *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Ins. Co. of North America v. Cohn*, 54 F.3d 1108 (3d Cir.1995). "The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start. Exceptions to discharge are strictly construed in favor of debtors." *Cohn*, 54 F.3d at 1113.

*Sub judice*, the layers of applicable complex insurance law make determination of the status of both JUA and MTF difficult;[50] yet the State is obligated to prove

---

**49.** The DMV surcharges remain a *funding source* (removed after 1982 from the ambit of the private marketplace), having contributed along the continuum from "market-opening" needs to liquidation of failed insurer entities. *See* N.J.S.A. 17:29A–35(b)(3). And it is still the Commissioner of Insurance rather than the Director of DMV who is responsible for DMV surcharge policy. *Id.* DMV surcharging is thus primarily funding for insurance enterprise, not policing.

**50.** Since the early nineteenth century, insurance regulation in America has been growing into an ill-shapen haphazard organism—

largely the product of the mindless, purposeless drift of circumstances. Dimly perceived problem has been followed by ill-conceived solution. A series of ad hoc responses has produced the typical American insurance code—a rubbish heap without parallel in the law-making of modern man. Viewed as a historical document, the insurance code is a palimpsest, the deciphering of which would tax the genius that was spent in reconstructing classical Roman law from the interpolations of the Justinian compilations. [KIMBALL, INTRODUCTION, UNFINISHED BUSINESS IN INSURANCE REGULATION, 1969 Wis. Law Rev. 1019.]

either that (now) MTF is a "governmental unit" or that such an agency (if not MTF), benefited from surcharge payments. Doubt favors Mrs. Pulley's right to a fresh start.

Viewed somewhat differently, the New Jersey program which imposes the DMV surcharges is an economic burden-shifting effort, purporting to move a certain part of the costs of automobile liability insurance from the general consuming public to a class of unsafe or irresponsible drivers. *See, e.g., Matter of Johnson,* 226 N.J.Super. 1, 543 A.2d 454 (App.Div.1988). That statutory purpose is akin to " 'the protection of the public . . . from financial hardship' resulting from involvement in traffic accidents with uninsured motorists unable to respond to a judgment," the underpinning to the Arizona statute reviewed in *Perez v. Campbell,* 402 U.S. 637, 653–54, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (*quoting Schecter v. Killingsworth,* 93 Ariz. 273, 380 P.2d 136, 140 (1963)). In *Perez,* the state statute provided that, notwithstanding a bankruptcy discharge, failure to satisfy such a judgment would result in suspension of driving privileges. That statute was held to be invalid under the supremacy clause. In fact, the New Jersey scheme calls for license suspension for failure to pay DMV surcharges, a penalty suffered by Mrs. Pulley over a period of years. *See* 11 U.S.C. § 525(a).

This court hastens to point out that New Jersey is entitled to place financial burdens for insurance costs on certain drivers pursuant to reasonably drafted legislative programs. It is likewise entitled to engage in that burden shifting through regulation of the insurance marketplace (with required private insurer participation). And, it can do all of this while separately and directly exercising its police power to penalize unsafe and irresponsible drivers (to the extent of fines, loss of license, and even imprisonment). But its efforts to direct DMV surcharge benefits to flow to marketplace entities, threatening and actuating license suspension for nonpayment, could well be inconsistent with the essence of *Perez. Perez* rejected certain precedent, including *Kesler v. Department of Public Safety,* 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962). In doing so, the Supreme Court referred (402 U.S. at 650–51, 91 S.Ct. 1704) with approval to the *Kesler* dissent, as follows:

> The [Kesler] majority . . . looked to the purpose of the state legislation and upheld it because the purpose was not to circumvent the Bankruptcy Act but to promote highway safety; those in dissent, however, were concerned that, whatever the purpose of the Utah Act, its "plain and inevitable effect * * * (was) to create a powerful weapon for collection of a debt from which (the) bankrupt (had) been relased [sic] by federal law." *Id.,* at 183, 82 S.Ct. 807. . . . Such a result, they argued, left "the States free * * * to impair * * * an important and historic policy of this Nation * * * embodied in its bankruptcy laws." [*Citing Kesler,* 369 U.S. at 185, 82 S.Ct. 807.]

In ultimate economic terms, New Jersey purports to answer the call for affordable auto insurance premiums. However, its 1982, 1990, and 1994 solutions could be viewed as burdening that part of the consuming public most affected by high premiums. Poor people (like Mrs. Pulley living on SSI in Jersey City) are, of course, most likely to lose coverage as premium rates skyrocket. When the poor are caught being "economically irresponsible," *i.e.,* driving without *un* affordable insurance, DMV surcharges and license suspension are inevitable. The net effect is that the poor, while in the greatest need of rate relief, are to shoulder the cost of that

purported relief through focused surcharges. Then, whatever earning power they have which depends on driving privileges could be denied them. The poor are thus trapped in the vortex of a runaway automobile insurance marketplace.

The surcharging solution to the intractable auto insurance issues remains within the purview of the State's regulatory powers. However, the fresh start safety net resides in bankruptcy. The New Jersey burden-shifting mechanism which funds marketplace entities must stop here at the bankruptcy discharge. Fresh start is fundamental.

### CONCLUSION

 MTF, the beneficiary of DMV surcharges, is not a "governmental unit." Its historic context and development belie a contrary conclusion. Heavily regulated, MTF nonetheless per the *Christy* test, is not an arm or alter ego of the State. The Bankruptcy Code's limited applicable legislative history supports excluding MTF from the defined term, "governmental unit." No concept of federalism is offended by this conclusion, while fresh start is promoted by the result. The State thus cannot carry its burden to establish DMV surcharges as an exception under 11 U.S.C. 523(a)(7) to Mrs. Pulley's bankruptcy discharge.

Summary judgment is granted the debtor,[51] Mrs. Pulley (and the State's motion is accordingly denied). DMV surcharges assessed against the debtor are discharged.

The court will enter its implementing order.

---

**51.** This court finds no need to reach other issues raised by plaintiff-debtor, including whether DMV surcharges are a "penalty" within the meaning of 11 U.S.C. 523(a)(7), and whether the State is estopped from contesting the issues decided here because of its positions in earlier cases.